1

2

3  O

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11

12  VIDA F. NEGRETE, as Conservator for )    Case No. CV 05-6838 CAS (MANx)
    EVERETT E. OW, an individual and on )             CV 05-8908 CAS (MANx)
13  behalf of all other similarly situated )
    persons,                             )
14                                        )    **ORDER GRANTING IN PART AND**
                         Plaintiff,       )    **DENYING IN PART DEFENDANT'S**
15                                        )    **THIRD MOTION FOR SUMMARY**
    vs.                                   )    **JUDGMENT**
16                                        )
                                          )
17  ALLIANZ LIFE INSURANCE                )
    COMPANY OF NORTH AMERICA,             )
18                                        )
                                          )
19                       Defendant.       )
    _____ )
20                                        )
    CAROLYN B. HEALEY, an individual,     )
21  and on behalf of all other similarly  )
    situated persons,                     )
22                                        )
    vs.                                   )
23                                        )
                                          )
24  ALLIANZ LIFE INSURANCE                )
    COMPANY OF NORTH AMERICA,             )
25                                        )
                                          )
26                       Defendant.       )
    _____ )
27  \\

28  \\

## I.    INTRODUCTION

In these related class action cases, plaintiffs Vida F. Negrete ("Negrete"), as conservator for Everett Ow ("Ow"), and Carolyn B. Healey ("Healey") (collectively, "plaintiffs"), on behalf of themselves and a nationwide class of an estimated 200,000 senior citizens, allege that defendant Allianz Life Insurance Company of North America, Inc. ("Allianz") conspired with a network of affiliated Field Marketing Organizations ("FMOs") to induce class members to purchase deferred annuities issued by Allianz by means of misleading statements and omissions regarding the value of those annuities.

Negrete filed suit against Allianz on September 19, 2005, alleging the following claims for relief: (1) violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, et seq. ("RICO"); (2) elder abuse under Cal. Welf. & Inst. Code §§ 15610 et seq. ("§ 15610"); (3) unlawful, unfair and fraudulent business practices under California's Unfair Competition Law ("the UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (4) false and misleading advertising under Cal. Bus. & Prof. Code §§ 17500, et seq. (the "False Advertising Law" or "FAL"); (5) breach of fiduciary duty; (6) aiding and abetting breach of fiduciary duty; and (7) unjust enrichment and imposition of constructive trust.  On December 22, 2005, Healey filed suit against Allianz, alleging similar claims for relief.  The Court ordered coordination of the two actions as related cases (collectively, "Negrete").  On November 21, 2006, the Court granted plaintiffs' motion for class certification as to their nationwide RICO claim, as well as a California-only subclass asserting statutory violations, including the UCL.  Negrete Dkt. No. 134 ("Class Order").

On March 12, 2010, Allianz moved for summary judgment on the RICO claims of certain Negrete class members which it contended were barred by the doctrine of claim preclusion as a result of the final judgment entered in Allianz's favor on January 29, 2010 in Mooney v. Allianz Life Ins. Co. of N. Am., Case No. CV 06-00545 (D. Minn) ("Mooney").  In an order issued August 18, 2010 (the "Claim Preclusion Order"), the

Court denied Allianz's motion for summary judgment and granted plaintiffs' cross-motion for partial summary judgment on Allianz's affirmative defense of claim preclusion.  Claim Preclusion Order at 24.

On June 10, 2011, Allianz filed a renewed motion for summary judgment on the RICO claims.  On October 13, 2011, the Court denied the motion, finding that disputed issues of material fact precluded summary judgment on the required elements of (1) a RICO enterprise; (2) an injury "by reason of" the conduct constituting the alleged RICO violation; and (3) a RICO conspiracy.  Dkt. No. 805 ("MSJ Order No. 2").

On May 30, 2012, Allianz filed a motion to decertify the nationwide class, a third motion for summary judgment, and a motion for judgment on the pleadings.  Dkt. Nos. 828–830.  Plaintiffs filed their oppositions on August 14, 2012, Dkt. Nos. 849–851, and defendant replied on October 15, 2012, Dkt. Nos. 885–887.  In an order issued December 27, 2012, the Court denied Allianz's motion to decertify the class in full.  Dkt. No. 929.  Allianz's third motion for summary judgment is presently before the Court.  Because the facts underlying this dispute are well-known to the parties and discussed at length in the Court's prior orders, the Court sets forth below only those facts pertinent to this motion, in conjunction with the parties' arguments.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out

1   specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v.

2   Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e).  The

3   nonmoving party must not simply rely on the pleadings and must do more than make

4   "conclusory allegations [in] an affidavit."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871,

5   888 (1990); see also Celotex, 477 U.S. at 324.  Summary judgment must be granted for

6   the moving party if the nonmoving party "fails to make a showing sufficient to establish

7   the existence of an element essential to that party's case, and on which that party will

8   bear the burden of proof at trial."  Id. at 322; see also Abromson v. Am. Pac. Corp., 114

9   F.3d 898, 902 (9th Cir. 1997).

10          In light of the facts presented by the nonmoving party, along with any undisputed

11   facts, the Court must decide whether the moving party is entitled to judgment as a matter

12   of law.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 &

13   n.3 (9th Cir. 1987).  When deciding a motion for summary judgment, "the inferences to

14   be drawn from the underlying facts . . . must be viewed in the light most favorable to the

15   party opposing the motion."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

16   U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.,

17   121 F.3d 1332, 1335 (9th Cir. 1997).  Summary judgment for the moving party is proper

18   when a rational trier of fact would not be able to find for the nonmoving party on the

19   claims at issue.  See Matsushita, 475 U.S. at 587.

20   **III.   ANALYSIS**

21          Allianz argues that partial summary judgment should be granted in its favor for

22   four independent reasons.  First, Allianz argues that plaintiffs fail as a matter of law to

23   prove as a matter of law that it is a "person" distinct from the alleged "Senior Annuity

24   Enterprise," such that there is no "enterprise" to which RICO liability can attach.

25   Second, Allianz contends that it is entitled to judgment on the RICO claims of any class

26   member who purchased annuities from field marketing organizations ("FMOs") that are

27   not part of the alleged Senior Annuity Enterprise, because class members who bought an

28

annuity from these "non-enterprise FMOs" were not injured because of the alleged RICO violation.  Third, Allianz seeks partial final judgment on all claims released by the <u>Iorio</u> class settlement, pursuant to the parties' stipulation.  Fourth, Allianz asserts that California's parol evidence rule bars the application of plaintiffs' RICO claims, to the extent that these claims are based upon a theory of promissory fraud.  Each argument is discussed in turn.

**A.  RICO Claims**

As noted in this Court's prior orders, plaintiffs allege RICO violations pursuant to 18 U.S.C. §§ 1962(c) and (d).  Section 1962, subpart c, makes it unlawful "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."  The essential elements of a claim premised upon a violation of § 1962(c) are thus (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity.  <u>Stanford</u> v. <u>MemberWorks, Inc.</u>, 625 F.3d 550, 557 (9th Cir. 2010).  Racketeering activity is defined to include a number of predicate acts, including mail and wire fraud.  18 U.S.C. § 1961(1).  Mail fraud, in turn, requires proof that a defendant (1) formed a scheme to defraud, (2) used the mails in furtherance of that scheme, and (3) "did so with the specific intent to deceive or defraud."  <u>Miller</u> v. <u>Yokohama</u> <u>Tire</u> <u>Corp.</u>, 358 F.3d 616, 620 (9th Cir. 2004).

Under section 1964(c), "[a]ny person injured in his business or property by reason of a violation of section 1962," can bring a claim for damages.  The "by reason of" language requires a plaintiff to prove "but for" causation, proximate causation, and a concrete financial loss to a protectable business or property interest.  <u>Hemi</u> <u>Group, LLC</u> <u>v.</u> <u>City</u> <u>of</u> <u>New</u> <u>York, N.Y.</u>, 130 S. Ct. 983, 989 (2010).  Plaintiffs must prove all of the required elements to succeed on their RICO claims.

\\

**1.  RICO Enterprise**

5

1
2
3
4
5
6
7
8
9
10
11

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This definition of enterprise is broad and illustrative, not exhaustive. See Boyle v. U.S., 556 U.S. 938, 944 n. 2 (2009); Odom v. Microsoft Corp., 486 F.3d 541, 548 (9th Cir. 2007) (noting that "this definition is not very demanding"). Enterprises include "any union or group of individuals associated in fact . . . associated together for the common purpose of engaging in a course of conduct." Boyle, 556 U.S. at 944 (quotations omitted). Under Boyle, an association-in-fact enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 946.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

In addition, "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). This so-called "distinctiveness" requirement is satisfied, for example, where "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." Id. at 163. In Cedric Kushner, the corporate owner ("RICO person") had allegedly used his wholly owned corporation ("RICO enterprise") as a "vehicle" for the commission of unlawful acts. Id. at 164–65. The Supreme Court distinguished—and declined to consider the merits of—lower court decisions finding the distinctiveness requirement unmet, where the alleged enterprise consisted of the corporation as the RICO "person," and "the corporation, together with all its employees and agents" as the "enterprise." Id. at 164. The Court cited with approval to McCullough v. Suter, 757 F.2d 142, 144 (7th Cir. 1985), which found that formal or practical separation would suffice to render an enterprise distinct from an individual. Cedric Kushner, 553 U.S. at 163.

28

As the Ninth Circuit has held before and after <u>Cedric</u> <u>Kushner</u>, the RICO enterprise need only be "different from, not the same as or part of, the person whose behavior [RICO] was designed to prohibit." <u>Living</u> <u>Designs</u>, <u>Inc.</u> <u>v.</u> <u>E.I.</u> <u>Dupont</u> <u>de</u> <u>Nemours</u> <u>& Co.</u>, 431 F.3d 353, 362 (9th Cir. 2005) (quoting <u>Rae</u> <u>v.</u> <u>Union</u> <u>Bank</u>, 725 F.2d 478, 481 (9th Cir. 1992)). Stated otherwise, the enterprise must be either "formally or practically separable from the person." <u>Id.</u> (citing <u>United</u> <u>States</u> <u>v.</u> <u>Benny</u>, 786 F.2d 1410, 1416 (9th Cir. 1986)); <u>see</u> <u>also</u> <u>River</u> <u>City</u> <u>Markets,</u> <u>Inc.</u> <u>v.</u> <u>Fleming</u> <u>Foods</u> <u>W.,</u> <u>Inc.</u>, 960 F.2d 1458, 1461 (9th Cir. 1992) (noting that "an individual cannot associate or conspire with himself" but "can associate with a group of which he is a member, with the member and the group remaining distinct entities"); <u>Sever</u> <u>v.</u> <u>Alaska</u> <u>Pulp</u> <u>Corp.</u>, 978 F.2d 1529, 1534 (9th Cir. 1992) (holding that formal or practical separation is sufficient).

According to plaintiffs, the Senior Annuity Enterprise consists of Allianz, the 13 FMOs in which Allianz holds ownership interests, and the 6 FMOs who have served as board members of the Market Advisory Committee ("MAC").[1] In the late 1990s, Allianz—and LifeUSA Holding Inc., which merged with Allianz in 1999—began acquiring ownership interests in certain FMOs under the banner of "Project Procure." Pl.'s Statement of Genuine Issues and Addt'l Material Facts ("PSGI") ¶¶ 1–14. By the end of the class period, Allianz had acquired all of or a majority stake in ten FMOs, and held a minority interest in three FMOs. PSGI ¶¶ 4, 8, 11. Plaintiffs contend that FMOs owned by Allianz serve much the same purpose, and perform much the same functions,

---

[1] Plaintiffs' briefing is not entirely consistent on this point. <u>Compare</u> MSJ Order No. 2 at 10 n. 2 (plaintiffs' allegation that the Enterprise includes only Allianz, Allianz-owned-FMOs, and MAC Board members) <u>and</u> Opp'n at 4 (same), <u>with</u> Opp'n at 9 (allegation that the enterprise "also includes the non-Allianz owned FMOs who target senior citizens") <u>and</u> Def.'s Ex. 4 at 20, ¶ 45 (same). Consistent with its prior order, the Court presumes that the alleged Senior Annuity Enterprise only includes the 13 Allianz-owned FMOs and the six FMOs that were members of the MAC Board, in addition to Allianz itself. In any event, the difference is immaterial to this motion.

as non-Allianz-owned FMOs.  For example, these FMO's recruit, train, and provide marketing support for their agents, and all are focused on the senior market, even if this is not the exclusive focus.  PSGI ¶¶ 136, 20–35.  Moreover, this Court has previously found that the MAC Board members have demonstrated a "high degree of coordinated conduct with respect to targeted sales to seniors."  MSJ Order No. 2 at 12.  And Allianz-owned FMOs sell products from as many as 40 other insurance companies.  PSGI ¶¶ 70, 73–74.

The six largest-producing FMOs served on the MAC Board, along with three standing members.  PSGI ¶ 37.  Plaintiffs contend that the enterprise includes six of these FMOs which are not owned by Allianz.  PSGI ¶¶ 38–43.  The degree of control Allianz exercises over the FMOs it does not own is defined by contract, PSGI ¶ 61, and Allianz and these FMOs do not share executives, employees, or co-mingle operating funds, and the FMOs handle payment of their operating expenses and employees.  PSGI ¶¶ 44–50.  The FMOs are entitled to unilaterally terminate their relationship with Allianz at any time.  PSGI ¶ 64.  All FMOs recruit and train agents, solicit sales of annuity products, deliver the policies to their purchaser, and collect the full initial premium for each policy sold.  PSGI ¶¶ 65, 136.  The FMOs have full control over which annuity products they decide to sell and contract with non-Allianz agents.  PSGI ¶¶ 68–69.  In addition, these FMOs sell various securities products offered by other insurance companies, including non-annuity products, and some of the FMOs also provide unrelated services like tax consulting, stock advice, and brokerage services.  PSGI ¶¶ 70–72.  As Allianz's former President and Chief Marketing Officer testified, these FMOs are "completely independent organizations."  PSGI ¶ 75.  On the other hand, Allianz retains full responsibility for developing deferred annuities and providing actuarial expertise necessary to manage the portfolio of Allianz annuities that the FMOs sell, and for approving and issuing the annuities.  PSGI ¶¶ 66, 67.  In exchange for their efforts, the FMOs earn commissions based on the amount of premiums sold, plus annual

1  bonuses tied to the total amount of premiums collected.  PSGI ¶ 99.

2      Focusing on plaintiffs' current and prior allegations with respect to the alleged

3  Senior Annuity Enterprise, Allianz paints a different factual picture, in addition to

4  arguing that plaintiffs are bound by their prior allegations or judicial admissions.

5  Allianz argues that plaintiffs describe "a functionally single-corporation 'enterprise,'"

6  which fails to satisfy the distinctiveness requirement articulated by <u>Cedric</u> <u>Kushner</u>.

7  Because a corporation can act only through its agents and affiliates, Allianz avers, "a

8  cognizable RICO enterprise must be more than an association of entities conducting the

9  defendant corporation's regular affairs."  <u>Id.</u>  Allianz contends that other federal courts,

10  considering similar allegations of RICO enterprises comprised of life insurance

11  companies and their agents and affiliated marketing organizations, have found the

12  distinctiveness requirement unmet.  <u>Id.</u> at 12–13.

13      In support of its contentions, Allianz notes plaintiffs' counsel's previous assertion

14  that "Allianz exerted control by having interlocking boards of directors and officers, by

15  imposing requirements and budgeting on them and by gaining more and more control."

16  DSUF ¶ 44.[2]  Plaintiffs also contended that Allianz-owned FMOs acted as its "pseudo-

17  captive sales force," DSUF ¶ 19, and that Allianz was "integrally involved in all aspects

18

19

20      [2] Allianz again focuses on the "impropriety" of plaintiffs narrowing the breadth of
the alleged Enterprise at oral argument in conjunction with Allianz's second motion for

21  summary judgment.  Def.'s Statement of Uncontraverted Facts ("DSUF") ¶¶ 41–44; <u>see</u>

22  Def.'s Reply to Pl.'s Statement of Genuine Issues and Material Facts ("DRPS") at 6–13.
As the Court noted in its prior order denying Allianz's motion, however, the Court "has the

23  discretion to deem the limitation of the Enterprise to be an amendment to the pleadings,"

24  but the Court declined to make that determination at that time.  Allianz also argues that
plaintiffs' present contentions contradict their prior allegations of a close-knit enterprise

25  subject to Allianz's control.  Reply at 7–10 (describing plaintiffs' allegations in their

26  complaints, arguments in support of their original motion for class certification, and
various subsequent filings).  These prior allegations and arguments are binding judicial

27  admissions, Allianz argues, and plaintiffs cannot now contradict these prior admissions to

28  withstand Allianz's third motion for summary judgment.

of the FMOs' business operations," DSUF ¶ 20 (quoting plaintiffs' Rule 16 disclosures). This involvement, according to plaintiffs, included "meeting with FMO management to develop annual budgets and profit goals, assisting with and improving marketing and sales operations, training FMO staff, assisting with hiring and terminations, transferring current Allianz employees to fill senior management positions within its wholly-owned FMOs, and conducting periodic meetings among its Project Procure FMOs to review business practices and exchange ideas regarding successful marketing and sales techniques." Id.

Moreover, FMO members of the alleged Senior Annuity Enterprise signed a Field Marketing Organization Addendum, which states that the FMO will act as Allianz's "agent, pursuant to which you solicit applications for insurance, annuities, riders, and other contracts (the policies)." DSUF ¶ 23.[3] Allianz also points to additional written agreements that plaintiffs allege that Allianz entered into with all of the FMOs, which "vested Allianz with 'exclusive authority . . . to determine the content of any advertisements, [or] sales literature," DSUF ¶ 22, and also the "specified operating standards" FMOs had to adhere to for marketing, recruiting and training of agents, and finance functions, DSUF ¶ 24. Beyond this agency relationship defined by contract, Allianz also notes plaintiffs' allegations of a close agency relationship between Allianz and the FMOs in practice. Allianz purportedly "strictly enforce[d]" rules regarding the provision of Statements of Understanding to all prospective purchasers, DSUF ¶ 27, approved all advertisements and marketing materials used by FMOs, id. ¶¶ 28–29, set minimum production requirements for agents and FMOs, id. ¶¶ 31–33, provided training

---

[3] Allianz argues that plaintiffs are mistaken in arguing that the FMOs at issue signed an "Agent Agreement for Associate Field Marketing Organizations" ("Agent Agreement"), rather than the "Field Marketing Organization Addendum" ("Addendum"). In contrast to the Addendum, the Agent Agreement states that the FMO is "to represent [Allianz] and to solicit applications for insurance, annuities, and other contracts" and that the FMO is "an independent contractor" of Allianz. Pl's Ex. 83 at 1.

and support to FMOs with respect to their sales staff, id. ¶¶ 34–36, and regularly communicated with its FMOs, agents, and MAC Board members regarding product development, marketing techniques, and compensation incentives, id. ¶¶ 37–40.  In sum, since plaintiffs—in their prior and current allegations—purportedly allege a "functionally single-corporation enterprise that is indistinct from Allianz," Allianz contends that the distinctness element has not been met here.  Mot. at 13.

The Court concludes that summary judgment for Allianz on the "distinctiveness" requirement is not warranted.  First, the Court notes that even an enterprise consisting of a parent and its subsidiary has been found sufficiently distinct for purposes of RICO liability.  See Watts v. Allstate Indem. Co., 08-cv-1877, 2009 WL 1905047, at * 6 (E.D. Cal. July 1, 2009) (reviewing Ninth Circuit cases and concluding that "a corporate parent is distinct from its corporate subsidiary such that one may be 'associated with' the other for purposes of a claim under 18 U.S.C. section 1962(c)"); but see In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig., 601 F. Supp. 2d 1201, 1214 (S.D. Cal. 2009) (finding that an enterprise comprised of a parent and its subsidiaries does not satisfy the distinctiveness requirement without "something more").[4]  Unlike situations where a single corporate defendant is alleged to have "conspire[d] with himself," River City, 960 F.2d at 1461, Allianz is alleged to have conspired with 19 formally-separate corporate entities (the enterprise) in furtherance of its alleged scheme to defraud.  And

---

[4] It is not clear that "something more" is required in this case, where the non-Allianz owned FMOs are not the subsidiaries of Allianz, but instead affiliates that solicit purchases of Allianz products from consumers.  See In re Countrywide, 601 F. Supp. 2d at 1214 (citing Bucklew v. Hawkins, Ash, Baptie & Co., LLP, 329 F.3d 923, 934 (7th Cir. 2003)); Fogie v. THORN Americas, Inc., 190 F.3d 889, 898 (8th Cir. 1999) (holding that "there must be a greater showing that the parent and subsidiary are distinct than the mere fact that they are separate legal entities").  However, even if "something more" than formal legal separation is required, the Court finds that plaintiffs could meet that burden here.  As discussed infra, there are a number of ways in which Allianz was functionally distinct from the FMOs at issue, in addition to utilizing the particular organizational structure that it did—rather than relying solely on Allianz employees—to advance its alleged scheme.

six of these FMOs are not owned by Allianz at all.  This formal separation is alone sufficient to support a finding of distinctiveness.

Second, there are numerous factual disputes with respect to the degree of control Allianz exercised over the FMOs, both those within and without the Senior Annuity Enterprise as presently defined.  Whether the 19 FMOs at issue were labeled Allianz's "agents" or "independent contractors" by contract does not resolve these disputes.[5] Plaintiffs demonstrate practical separation between Allianz and the FMO members of the alleged enterprise, regardless of the labels that were attached to the particular relationships between Allianz and its FMO partners.  While the evidence supports plaintiffs' contention that all of the FMOs work with Allianz with a view towards selling as many annuity products as possible in the senior market, this common purpose and other evidence of coordination does not make the FMOs and Allianz indistinguishable.  See Migliaccio v. Midland Nat'l Life Ins. Co., 2007 WL 316873, at *3 n. 1 (C.D. Cal. Jan. 30, 2007) (finding that sales agents were not "so closely related that they could be viewed as a single entity" where the agents "can and do contract to sell deferred annuity products issued by other companies").  Particularly with respect to Allianz and the FMOs it does not own, Allianz does not dispute the numerous ways in which these FMOs operate independently: selling annuity products offered by other companies,

---

[5] In their Response to Allianz's Separate Statement, plaintiffs did not dispute Allianz's contention that Allianz and each of the alleged Senior Annuity Enterprise FMOs signed an Addendum rather than an Agent Agreement.  See id. ¶ 23.  In their Opposition, however, plaintiffs argue that "under the terms of the standardized agreement, the FMOs are expressly defined as 'independent contractors,'" quoting the language of the Agent Agreement.  Opp'n at 5; PSGI ¶¶ 61–63.  Whether or not plaintiffs are disputing the validity of Allianz's contention regarding the Agent Agreement, the Court notes that Allianz fails to provide any evidence that all 19 FMOs at issue signed the Addendum, rather than the Agent Agreement.  The only exhibit that Allianz points to in support of its contention is Def.'s Ex. 6, a signed Addendum between Brokers International, Ltd., and Allianz.  This evidence is insufficient, standing alone, for Allianz to prove that all the FMOs at issue signed one or the other FMO operating agreement with Allianz.

offering non-annuity related services to their clients, contracting with non-Allianz agents, and retaining control over their operations and core business functions.  See Fogie, 190 F.3d at 898 (finding no distinctiveness where the alleged enterprise consisted of only of entities that "are part of one corporate family operating under common control").  This evidence belies Allianz's assertion that it and the alleged Senior Annuity Enterprise are really one and the same, or that the only business of the FMOs is "the marketing and sale of life and annuity products," Reply at 14.

That FMO members may have "acted as the face of Allianz" does not necessarily lead to the conclusion that the alleged enterprise here must be viewed as one indistinguishable whole, because the FMOs appear to have also acted independently of Allianz in numerous ways.  Quite simply, there is nothing inconsistent between a finding that Allianz has exerted some control over the FMOs at issue on the one hand, with a finding that the level of control that Allianz has exerted does not render the alleged enterprise indistinguishable from Allianz itself on the other.  See California Pharmacy Mgmt., LLC v. Zenith Ins. Co., 669 F. Supp. 2d 1152, 1164 (C.D. Cal. 2009) (finding that "a mere relationship, whether contractual or even structural, between two corporate defendants does not preclude their legal separability," for purposes of RICO liability); see also In re Nat'l W. Life Ins. Deferred Annuities Litig., 467 F. Supp 2d 1071, 1085 (S.D. Cal. 2006) (finding distinctiveness satisfied where the alleged RICO enterprise "includes additional persons" who are not "RICO persons"); Bendzak v. Midland Nat. Life Ins. Co., 440 F. Supp. 2d 970, 988–89 (S.D. Iowa 2006) (same).[6]

In fact, it was Allianz who previously argued that it does not "direct the business activities" of the FMOs, does not require agents to attend training programs, and does

---

[6] Allianz attempts to distinguish these cases because the alleged enterprise here does not include any "individual sales agents," unlike the enterprises at issue in Bendzak and Nat'l Western.  Reply at 14.  Nothing in these decisions, however, implies that the distinctiveness requirement would not be met without the inclusion of sales agents in the alleged enterprises.

not require agents to use "specified sales techniques," in an attempt to counter plaintiffs' evidence of a common purpose and sufficient relationships between the members of the alleged enterprise.  MSJ Order No. 2 at 9.  Now Allianz notes plaintiffs' prior arguments and allegations in arguing that the Allianz-owned FMOs are indistinguishable from Allianz itself, due to the significant level of control that Allianz allegedly exerted over these and all other FMOs.  Contrary to Allianz's contentions, however, plaintiffs have not offered allegations and evidence of a materially different Senior Annuity Enterprise on this motion, as plaintiffs' arguments are not inconsistent with their prior representations.  Instead, plaintiffs focus on the non-Allianz-owned FMOs who are MAC Board members, arguing that these FMOs operate with a degree of independence from Allianz.  Thus, plaintiffs contend that it is these FMOs that provide the requisite "distinctiveness" between the alleged RICO person and enterprise.  Because much remains in dispute about how "tightly" Allianz did, in fact, control these non-Allianz-owned FMOs, the Court finds that genuine disputes remain as to whether the combination of Allianz, these MAC Board members, and Allianz-owned FMOs fails to satisfy the distinctiveness requirement.

Allianz's other principal authorities do not support a contrary conclusion here. For example, courts in the Ninth Circuit have dismissed a plaintiff's RICO claim where the "corporate family of . . . Defendants" constituted both the alleged person and enterprise for purposes of a RICO claim.  In re Toyota Motor Corp., 785 F. Supp. 2d 883, 922 (C.D. Cal. 2011); see also Ice Cream Distributors of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc., 09-cv-5815, 2010 WL 3619884 (N.D. Cal. Sept. 10, 2010) aff'd, 487 F. App'x 362 (9th Cir. 2012) (finding that a "§ 1962(c) claim could not be based on a RICO enterprise comprised of a corporation, a wholly-owned subsidiary and an employee of that corporate family if these entities were also plead as the RICO persons").  As noted, disputed issues of fact remain as to whether Allianz and all 19 of the FMO members of the alleged Senior Annuity Enterprise can be considered the same

"corporate family," particularly where Allianz held no ownership interest in six of these FMOs.  And whether Allianz-owned or not, none of the FMOs are pled as RICO persons in this case.  In addition, the Court notes that these decisions relied heavily on out-of-circuit precedent, including <u>Riverwoods</u> <u>Chappaqua</u> <u>Corp.</u> <u>v.</u> <u>Marine</u> <u>Midland</u> <u>Bank</u>, 30 F.3d 339 (2nd Cir. 1994), while ignoring the Supreme Court's favorable citation to <u>McCullough</u> <u>v.</u> <u>Suter</u>, 757 F.2d 142, 144 (7th Cir. 1985), a decision that the Ninth Circuit has also cited to with approval.  <u>See</u> <u>In</u> <u>re</u> <u>Countrywide</u>, 601 F. Supp. 2d at 1214 (discussing out-of-circuit authority and the "formal or practically separable" definition of distinctiveness from <u>McCullough</u>); <u>Mattel,</u> <u>Inc.</u> <u>v.</u> <u>MGA</u> <u>Entm't,</u> <u>Inc.</u>, 782 F. Supp. 2d 911, 1037–38 (C.D. Cal. 2011) (finding "professional independence" to be the critical question for determining distinctiveness of a member of the alleged enterprise "never employed by the corporation").  The evidence in the record demonstrates that despite coordination on some aspects of their business, the non-Allianz owned FMOs possessed significant independence from Allianz itself—and these FMOs are at most affiliates of Allianz, not subsidiaries.[7]

Allianz's citations to out-of-circuit decisions such as <u>Marlow</u> <u>v.</u> <u>Allianz</u> <u>Life</u> <u>Ins.</u> <u>Co.</u> <u>of</u> <u>N.</u> <u>Am.</u>, No. 08-cv-0752, 2009 WL 1328636 (D. Colo. May 12, 2009), <u>Levinson</u> <u>v.</u> <u>Mass.</u> <u>Mut.</u> <u>Life</u> <u>Ins.,</u> <u>Co.</u> 06-cv-086, 2006 WL 3337419 (E.D. Va. Nov. 9, 2006), <u>Rowe</u> <u>v.</u> <u>Bankers</u> <u>Life</u> <u>&</u> <u>Cas.</u> <u>Co.</u>, 09-cv-0491, 2010 WL 3699928 (N.D. Ill. Sept. 13, 2010), and <u>Mear</u> <u>v.</u> <u>Sun</u> <u>Life</u> <u>Assur.</u> <u>Co.</u> <u>of</u> <u>Canada</u>, 06-cv-12143, 2008 WL 245217, at *8–9 (D. Mass. Jan. 24, 2008), are similarly unpersuasive.  The complaint in <u>Marlow</u> was dismissed at the pleading stage, where the alleged enterprise consisted of Allianz

---

[7] Allianz's reliance on the unpublished decision in <u>Chagby v. Target Corp.</u>, 358 F. App'x 805, 808 (9th Cir. 2009), is also misplaced.  The Ninth Circuit summarily affirmed a dismissal of a complaint that the court found had profound shortcomings in both its theory of fraud and various other elements of RICO; the court's finding with regards to the distinctiveness requirement was offered without explanation and was unnecessary to its affirming the decision below.

and the plaintiff's former lawyer; the plaintiff alleged that the enterprise members conspired to make him "the scapegoat in an investigation into Allianz's improper insurance sales practices."  2009 WL 1328636, at *1.  The court relied heavily on Fitzgerald v. Chrysler Corp., 116 F.3d 225, 227 (7th Cir. 1997), for the proposition that an enterprise consisting of a corporation and its subsidiaries could not satisfy the distinctiveness requirement without any additional allegations as to how this structure facilitated the defendant's alleged enterprise.  Even if the reasoning of Fitzgerald applies, it does not help Allianz here.  Unlike the plaintiff in Marlow, plaintiffs have presented substantial allegations and evidence that Allianz has used the FMOs at issue to advance its scheme, relying on a broad network of sales agents that sell insurance products from many different companies.  Opp'n at 13–14; see, e.g., Pl.'s Ex. 149 (detailing the importance of FMO relationships to Allianz's "competitive advantage" in the annuities market).  In this way, it appears that genuine issues of fact remain as to how Allianz's "decision to operate through subsidiaries rather than divisions somehow facilitated" its allegedly unlawful scheme.  Bucklew, 329 F.3d at 934; see also Rowe, 2010 WL 3699928, at *4 (dismissing case based upon a finding the distinctiveness requirement was unmet under the Fitzgerald test); Mear, 2008 WL 245217, at *8 (applying First Circuit law and dismissing case based upon the court's conclusion that the independent insurance agents acted "as puppets under [the defendant's] control").  None of these decisions compel a contrary conclusion in this case, because even if plaintiffs must prove something more than legal distinctiveness, the evidence in the record appears to support plaintiffs' contention that the non-Allianz-owned FMOs were functionally distinct from Allianz during the duration of the alleged enterprise.

For all of the foregoing reasons, the Court finds that disputed issues of fact preclude a grant of summary judgment in Allianz's favor on the issue of distinctiveness.

### 2.    "By Reason Of" Requirement for Annuity Purchases from Non-Enterprise FMOs

Any RICO claim for damages requires proof of an injury to "business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). As discussed previously, section 1962, subpart c, makes it unlawful for "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Id. § 1962(c). And the "by reason of" language of section 1964 requires a plaintiff to prove "but for" causation, proximate causation, and a concrete financial loss to a protectable business or property interest. See Hemi Group, 130 S. Ct. at 989; see Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008) ("RICO provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as mail fraud."). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461(2006). "A link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient." Hemi Group, 130 S. Ct. at 989 (quoting Holmes v. Securities Investor Protection Corporation, 503 U.S. 258, 271, 274 (1992)). Relevant considerations for the directness inquiry include:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc., 185 F.3d 957, 963 (9th Cir. 1999) (citing Holmes, 503 U.S. at 269–70; see also Bridge, 553 U.S. at 655.

Allianz argues that any class members who purchased their annuities from FMOs which are no longer a part of the alleged Senior Annuity Enterprise did not suffer injury

"by reason of" Allianz's operation or management of the enterprise's affairs.  Mot. at 15.
In Allianz's view, the "enterprise's affairs" consisted of no more than those annuity sales
made through the 19 FMOs that were members of the enterprise, and class members who
purchased annuities from non-enterprise FMOs cannot be considered the "direct"
victims of this enterprise's conduct.  At most, Allianz contends, class members who
purchased annuities from non-enterprise FMOs were injured as a result of mail or wire
fraud, but not as a result of the alleged enterprise's activities.  Id.  This is so, Allianz
argues, because the dissemination of consumer brochures and SOUs were "non-
enterprise activities," unrelated to Allianz's operation or management of the alleged
enterprise.  Reply at 17.  Therefore, since only Allianz—not the other 19 FMO members
of the alleged enterprise—was allegedly involved in designing and issuing the annuity
products and overseeing the non-enterprise FMOs, Allianz's management of this
enterprise had nothing to do with the injuries of any class members who purchased their
annuities from non-enterprise FMOs.  Id. at 17–18.

In opposition, plaintiffs note this Court's previous finding that proximate
causation can be shown classwide through class members' signatures on the Statements
of Understanding ("SOUs"), which, plaintiffs argue, applies whether or not the FMO
that sold the annuity is part of the alleged enterprise.  Opp'n at 15 (citing PSGI
¶¶ 139–141).  Because class members that purchased their annuity from non-enterprise
FMOs still had to sign the "Allianz-mandated" SOU, they suffered an injury by reason
of Allianz's operation of the enterprise.  This is especially true here, plaintiffs argue,
where the evidence demonstrates that Allianz was the leader of the alleged
enterprise—designing and issuing the annuity products, training sales agents through
workshops and seminars, and determining the content of written sales materials.  Id. at
16 (citing PSGI ¶¶ 103–134).[8]  In addition, plaintiffs contend that because all of the

---

[8] Allianz's primary objections to all of these facts is materiality—that none of these
(continued...)

FMOs were "necessary" to carry out the alleged scheme, serving as Allianz's "innocent or unsuspecting agent" for the sales of its products, any harm suffered by the class members occurred as a direct result of Allianz's direction of the overall enterprise. Plaintiffs aver that RICO imposes liability not only on persons who commit the prohibited predicate acts, but also on those persons who cause the acts to be committed. In support of their contentions, plaintiffs cite to a number of cases standing for the principle that a causal link is not broken by the presence of a third party intermediary who is not a member of the alleged enterprise. Because Allianz has "instigated" the alleged scheme to defraud seniors, plaintiffs argue that Allianz caused harm that was "both foreseeable and intended." Opp'n at 18.

The Court concludes that Allianz is not entitled to a grant of summary judgment on this issue. A RICO defendant's conduct cannot be so neatly divided into "enterprise activities" and "non-enterprise activities," with only the former supporting liability under RICO. Contrary to Allianz's contentions, all of Allianz's conduct in furtherance of the alleged enterprise's affairs—whether Allianz acted alone or in conjunction with other members of the enterprise—are what caused the class members to suffer their alleged injuries.[9] Thus, Allianz's development of the annuity products, design and

_____

[8](...continued)
facts raise a genuine issue of fact relevant to any of the four grounds upon which Allianz seeks a grant of summary judgment in its favor. As discussed in this order, however, plaintiffs's additional facts are not "immaterial" to the issues that Allianz raises by way of its motion, but raise disputed issues that preclude a grant of summary judgment in Allianz's favor. In addition, Allianz makes numerous evidentiary objections, primarily on the grounds that plaintiffs mischaracterize the contents of various exhibits or fail to lay a proper foundation for their admission. Having reviewed the exhibits in question, the Court finds Allianz's objections are largely without merit for the evidence relied on in this order. To the extent that plaintiffs have mischaracterized various exhibits or rely on irrelevant evidence, the Court disregards plaintiffs' contentions of fact to the contrary.

[9] Plaintiffs cite to the "foreseeable and natural" consequence standard of proximate
(continued...)

dissemination of the marketing materials and SOUs, creation and utilization of the MAC Board to further its marketing efforts, and leadership of the enterprise are all "enterprise activities" that were undertaken in furtherance of an alleged scheme to defraud financial products purchasers. See MSJ Order No. 2 at 13 (noting plaintiffs' evidence that Allianz "owned and controlled 13 FMOs, retained the right to terminate any FMO, trained sales agents, and required all FMOs and sales agents to promise in writing to supply customers with particular product brochures and SOUs"). This also includes the allegedly excessive commissions and lucrative incentive programs that Allianz created for all FMOs and their agents, see PSGI ¶¶ 133, 135, which purportedly furthered the enterprise's "common purpose" of increasing the sales of Allianz products in the senior market, MSJ Order No. 2 at 12 (discussing plaintiffs' evidence of a common purpose).[10]

Moreover, as discussed in this and prior orders, plaintiffs have presented substantial evidence of how the FMOs that are members of the enterprise are purportedly what enabled Allianz to carry out its alleged scheme as successfully as it did, providing Allianz with its "competitive advantage" in the annuity and financial products marketplace.[11] See MSJ Order No. 2 at 10–11 (detailing substantial communications and

_____

[9](...continued) cause from Bridge in arguing that they have satisfied the proximate causation requirement here. The Court notes, however, that the Supreme Court appeared to implicitly disavow reliance on this language from Bridge in the Hemi Group decision: "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm," not foreseeability. 130 S. Ct. at 991.

[10] Although the parties do not discuss the "directness" factors from the Holmes decision, these considerations also support a finding that plaintiffs and their fellow class members are the most direct—indeed, the intended victims—of the enterprise's alleged scheme to defraud.

[11] As with those cases plaintiffs cite in their opposition, Allianz here "created and maintained systematic links for a common purpose" to aid in the marketing of its annuity (continued...)

involvement of MAC Board in improving product marketing, design, and development).
Allianz cannot unilaterally redefine the alleged enterprise's affairs based upon an
exceedingly narrow conception of Allianz's "operation or management" of the 19 FMO
members of the enterprise, while ignoring plaintiffs' evidence that Allianz undertook all
of these actions in furtherance of the enterprise's affairs—and not simply its own.

Because all of Allianz's actions appear to have been in furtherance of the alleged
enterprise's unlawful scheme—and not a frolic and detour by Allianz alone—a
reasonable jury could find that all of the class members were directly injured by the
enterprise's affairs.  Accordingly, Allianz's motion for summary judgment on this issue
is denied.

## C.    <u>Iorio</u> Judgment and Release

Plaintiffs do not dispute that pursuant to the parties' stipulation and this Court's
order, final judgment is appropriate on all the claims released by the settlement
agreement in <u>Iorio</u> v. <u>Allianz</u> <u>Life</u> <u>Ins.</u> <u>Co.</u> of <u>N.</u> <u>Am.</u>, No 05-cv-0633 (S.D. Cal. 2008).
<u>See</u> Dkt. No. 814 (ordering that the <u>Iorio</u> release is effective "to release and bar further
prosecution of . . . any and all of the claims included within the Released Transactions
described in the <u>Iorio</u> Agreement and Judgment").  Allianz argues that by its plain terms,
this order includes the claims asserted on Ow's behalf with respect to his MasterDex 10
annuity purchase.

In opposition, plaintiffs contend that Ow's claims related to his MasterDex 10
annuity are not subject to the <u>Iorio</u> settlement and release, because Ow "has
demonstrated his intent to exclude himself from the <u>Iorio</u> action" by filing and
prosecuting the instant case, partly on the basis of his purchase of the MasterDex10

---

[11](...continued)
products. <u>See</u> In re Actiq Sales & Mktg. Practices Litig., 07-cv-4492, 2009 WL 1444443,
at *5 (E.D. Pa. May 22, 2009) (discussing an alleged enterprise consisting of a
pharmaceutical company and pain management specialists and other doctors paid to
publish articles on the defendant's behalf).

annuity.  Opp'n at 24.  In particular, plaintiffs argue that Ow need not have formally opted-out of the <u>Iorio</u> action, and is not bound by the order entered in this case, because prosecution of this "competing" class action was effective to register his intent to exclude himself.

The Court finds that contrary to plaintiffs' contentions, Ow's claims with respect to his MasterDex 10 annuity are also subject to the <u>Iorio</u> release.  Notably, plaintiffs do not dispute that Ow did not explicitly opt-out of the <u>Iorio</u> settlement; that plaintiffs did not expressly exclude Ow's claims from the "Released Transactions" that this Court ordered extinguished, Dkt. No. 812; or that the <u>Iorio</u> release would otherwise be effective to bar Ow's prosecution of his claims, save for Ow's prosecution of this case.  Absent any language excluding Ow's MasterDex 10 claims from the scope of the parties' stipulation to enforce the <u>Iorio</u> release, the Court cannot carve-out an exception to its prior order for Ow to prosecute these claims in this case.

In addition, Ow's prosecution of this lawsuit is insufficient to serve as an opt-out from the <u>Iorio</u> class and settlement agreement.  While filing of an individual lawsuit *during* the pendency of the opt-out period is "an effective expression of a class member's desire to opt out," <u>McCubbrey v. Boise Cascade Home & Land Corp.</u>, 71 F.R.D. 62, 69 (N.D. Cal. 1976), courts have repeatedly found that maintenance of a separate lawsuit, which was initiated *prior* to the plaintiff receiving notice of the proposed settlement, does not serve as an opt-out from the class settlement.  <u>See</u> <u>Bowman v. UBS Fin. Services, Inc.</u>, 04-cv-3525, 2007 WL 1456037, at *2 (N.D. Cal. May 17, 2007) (collecting cases).  Here, plaintiff Ow indisputably filed this lawsuit long before the proposed settlement was reached in <u>Iorio</u>; as such, his maintenance of this suit was insufficient to opt-out of the <u>Iorio</u> settlement and judgment.  Plaintiffs offer no authority to the contrary, as <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011(9th Cir. 1998), is distinguishable.  There, a member of the <u>Hanlon</u> class initiated a separate lawsuit after the proposed <u>Hanlon</u> class settlement was submitted but before it was approved,

apparently for the sole purpose of excluding himself and others from the <u>Hanlon</u> settlement class. <u>Id.</u> at 1024–25. The court agreed with the district court that this class member's actions were sufficient to "serve[] as an individual opt-out" from the <u>Hanlon</u> case. Unlike the absent class member in <u>Hanlon</u>, Ow initiated the <u>Negrete</u> action long before a proposed settlement was reached in <u>Iorio</u>, and the mere maintenance of this long-running suit is insufficient to serve as Ow's opt-out from <u>Iorio</u>. Accordingly, the Court finds that judgment shall be entered on the claims of all class members barred by the <u>Iorio</u> agreement and judgment, including Ow's claims with respect to his purchase of the MasterDex 10 annuity.

### D.  Parol Evidence Rule

Allianz argues that this Court should apply the parol evidence rule from California law to plaintiffs' federal RICO claims, which Allianz contends are premised upon a promissory fraud theory of liability. The Court disagrees.

Generally, the parol evidence rule does not act to bar extrinsic evidence related to a fraud claim rather than a breach of contract claim. Cal. Code of Civil P. § 1856(f). Until very recently, however, the parole evidence rule did preclude "*promissory* fraud claims premised on prior or contemporaneous statements at variance with the terms of a written integrated agreement." <u>Casa</u> <u>Herrera</u>, 32 Cal. 4th at 346 (emphasis added) (quoting <u>Bank</u> <u>of</u> <u>Am. etc.</u> <u>Assn.</u> <u>v.</u> <u>Pendergrass</u>, 4 Cal. 2d 258 (1935)). But in <u>Riverisland</u> <u>Cold</u> <u>Storage, Inc.</u> <u>v.</u> <u>Fresno-Madera</u> <u>Prod.</u> <u>Credit</u> <u>Ass'n</u>, S190581, — Cal. 4th —, 2013 WL 141731 (Cal. Jan. 14, 2013), the California Supreme Court overruled <u>Pendergrass</u> and its progeny, concluding that the limitation on the fraud exception to the parol evidence rule was "plainly out of step with established California law," and also "inconsistent with the terms of [section 1856]." <u>Id.</u> at *8. In overruling <u>Pendergrass</u>, the court "reaffirm[ed] the venerable maxim [that] it was never intended that the parol evidence rule be used as a shield to prevent the proof of fraud" from entering the courtroom. <u>Id.</u> (citation and quotation omitted).

Given this recent evolution of California law, Allianz's argument that plaintiffs have "characterized" their RICO claims in promissory fraud terms fails in light of <u>Riverisland</u>.  Because plaintiffs bring RICO claims grounded in fraud—not claims for breach of contract—evidence related to their claims is plainly not barred by the parol evidence rule.  <u>Riverisland</u>, 2013 WL 141731 at *1.  None of Allianz's arguments, nor the cases Allianz relies on, survive the force of the California Supreme Court's decision in <u>Riverisland</u>.  Accordingly, Allianz's motion for summary judgment on this basis is denied.

\\

## V.  CONCLUSION

In accordance with the foregoing, Allianz's motion for summary judgment is hereby GRANTED in part and DENIED in part.  Judgment shall be entered on the claims of all class members barred by the <u>Iorio</u> agreement and judgment pursuant to this Court's prior order.

IT IS SO ORDERED.

Dated: February 25, 2013

_____
CHRISTINA A. SNYDER
United States District Judge

24