1

2

3                                                                    O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                          WESTERN DIVISION

11

12   VIDA F. NEGRETE, as Conservator for )    Case No. CV 05-6838 CAS (MANx)
     EVERETT E. OW, an individual and on )             CV 05-8908 CAS (MANx)
13   behalf of all other similarly situated )
     persons,                             )
14                                        )   **ORDER DENYING DEFENDANT'S**
                      Plaintiff,          )   **MOTION FOR JUDGMENT ON**
15                                        )   **THE PLEADINGS**
     vs.                                  )
16                                        )
                                          )
17   ALLIANZ LIFE INSURANCE               )
     COMPANY OF NORTH AMERICA,            )
18                                        )
                                          )
19                    Defendant.          )
     _____ )
20                                        )
     CAROLYN B. HEALEY, an individual,    )
21   and on behalf of all other similarly )
     situated persons,                    )
22                                        )
     vs.                                  )
23                                        )
                                          )
24   ALLIANZ LIFE INSURANCE               )
     COMPANY OF NORTH AMERICA,            )
25                                        )
                                          )
26                    Defendant.          )
     _____ )
27   \\

28   \\

## I.    INTRODUCTION

In these related class action cases, plaintiffs Vida F. Negrete ("Negrete"), as conservator for Everett Ow ("Ow"), and Carolyn B. Healey ("Healey") (collectively, "plaintiffs"), on behalf of themselves and a nationwide class of an estimated 200,000 senior citizens, allege that defendant Allianz Life Insurance Company of North America, Inc. ("Allianz") conspired with a network of affiliated Field Marketing Organizations ("FMOs") to induce class members to purchase deferred annuities issued by Allianz by means of misleading statements and omissions regarding the value of those annuities.

Negrete filed suit against Allianz on September 19, 2005, alleging the following claims for relief: (1) violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, et seq. ("RICO"); (2) elder abuse under Cal. Welf. & Inst. Code §§ 15610 et seq. ("§ 15610"); (3) unlawful, unfair and fraudulent business practices under California's Unfair Competition Law ("the UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (4) false and misleading advertising under Cal. Bus. & Prof. Code §§ 17500, et seq. (the "False Advertising Law" or "FAL"); (5) breach of fiduciary duty; (6) aiding and abetting breach of fiduciary duty; and (7) unjust enrichment and imposition of constructive trust.  On December 22, 2005, Healey filed suit against Allianz, alleging similar claims for relief.  The Court ordered coordination of the two actions as related cases (collectively, "Negrete").  On November 21, 2006, the Court granted plaintiffs' motion for class certification as to their nationwide RICO claim, as well as a California-only subclass asserting statutory violations, including the UCL.  Negrete Dkt. No. 134 ("Class Order").

On March 12, 2010, Allianz moved for summary judgment on the RICO claims of certain Negrete class members which it contended were barred by the doctrine of claim preclusion as a result of the final judgment entered in Allianz's favor on January 29, 2010 in Mooney v. Allianz Life Ins. Co. of N. Am., No. 06-cv-0545 (D. Minn) ("Mooney").  In an order issued August 18, 2010 (the "Claim Preclusion Order"), the

1  Court denied Allianz's motion for summary judgment and granted plaintiffs' cross-

2  motion for partial summary judgment on Allianz's affirmative defense of claim

3  preclusion.  Claim Preclusion Order at 24.

4      On June 10, 2011, Allianz filed a renewed motion for summary judgment on the

5  RICO claims.  On October 13, 2011, the Court denied the motion, finding that disputed

6  issues of material fact precluded summary judgment on the required elements of (1) a

7  RICO enterprise; (2) an injury "by reason of" the conduct constituting the alleged RICO

8  violation; and (3) a RICO conspiracy.  Dkt. No. 805 ("MSJ Order No. 2").

9      On May 30, 2012, Allianz filed a motion to decertify the nationwide class, a third

10  motion for summary judgment, and a motion for judgment on the pleadings.  Dkt. Nos.

11  828–830.  Plaintiffs filed their oppositions on August 14, 2012, Dkt. Nos. 849–851, and

12  defendant replied on October 15, 2012, Dkt. Nos. 885–887.  In an order issued

13  December 27, 2012, the Court denied Allianz's motion to decertify the class in full.  Dkt.

14  No. 929.  After considering the parties' arguments, the Court finds and concludes as

15  follows.

16  **II.    BACKGROUND**

17      Because application of the McCarran-Ferguson Act to plaintiffs' RICO claim

18  depends upon the factual allegations that support it, the Court first addresses the

19  gravamen of plaintiffs' claims.  The facts of this case are well-known to the parties and

20  detailed in this Court's prior orders; an overview of the pertinent facts is set forth below.

21  See, e.g., Dkt. 805 at 2–4 ("MSJ No. 2"); Dkt. No. 929 at 3–4 ("Class Decertification

22  Order").

23      Plaintiffs contend that the evidence at trial will establish the following.  See Def.'s

24  Ex. 4 (Plaintiff's Contentions of Fact and Law).  Allianz was the orchestrator of a

25  scheme to defraud elderly class members by misrepresenting the true value of its

26  deferred annuity products in its marketing materials.  In particular, plaintiffs allege that

27  Allianz made three specific misrepresentations as part of a standardized marketing

28

program: that Allianz's annuities carried "no sales charges," offered an "immediate bonus," and would pay "full value" if certain deferral requirements were met.  For a number of reasons, plaintiffs contend that these descriptions were false and misleading, because Allianz annuities were in fact burdened by high sales charges; offered a bonus that was illusory and recouped by Allianz over time; and did not provide the stated "annuitization value," as Allianz reduced the account values by an undisclosed haircut, depending on when an individual annuitized.  Plaintiffs aver that the three alleged misrepresentations, made as part of Allianz's scheme to defraud elderly purchasers, have caused "direct and quantifiable injury" to the members of the class, because the Allianz "annuities are necessarily worth less as a result of the undisclosed hidden charges" on the date of purchase.

Allianz sold these annuity products through a network of Field Marketing Organizations ("FMOs"), 19 of which are members of the alleged RICO enterprise at the heart of this case.  <u>See</u> MSJ No. 2 at 7.  Allianz provided training opportunities, solicited feedback regarding its products, set minimum production requirements, and offered marketing advice and generous commissions to FMOs and their agents who sold Allianz products in furtherance of its alleged scheme to defraud.  These marketing tactics included Allianz's "Seminar Selling System," a turnkey solution which was allegedly designed to exploit the financial insecurity and fears of senior citizens with respect to other financial investments, while presenting Allianz deferred annuities as the preferred solution.

These FMOs and their sales agents were responsible for providing all prospective purchasers with a sales brochure containing these three alleged misrepresentations of the Allianz annuities, along with a Statement of Understanding ("SOU").  Upon signing the SOU, annuity purchasers acknowledged that they had received and read the relevant sales brochure and the sales agent countersigned, acknowledging that he or she had not made any representations that diverged from the content of the brochure.  Plaintiffs

maintain that their annuities had measurably lower yields, higher surrender charges, lost principal, and premium overcharges as a result of these three representations, causing them financial harm.

## III.   LEGAL STANDARD

A motion for judgment on the pleadings brought pursuant to Fed. R. Civ. P. 12(c) provides a means of disposing of cases when all material allegations of fact are admitted in the pleadings and only questions of law remain.  See McGann v. Ernst & Young, 102 F.3d 390, 392 (9th Cir. 1996).  "A judgment on the pleadings is properly granted when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law."  Id.  In considering a Rule 12(c) motion, the district court must view the facts presented in the pleadings and the inferences to be drawn from them in the light most favorable to the nonmoving party.  NL Indus. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986); In re Century 21-Re/Max Real Estate Adver. Claims Litig., 882 F. Supp. 915, 921 (C.D. Cal. 1994).  For purposes of the motion, the moving party concedes the accuracy of the factual allegations of the complaint, but does not admit other assertions that constitute conclusions of law or matters that would not be admissible in evidence at trial.  5C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2004).

Although Rule 12(c) contains no mention of leave to amend, "courts generally have discretion in granting 12(c) motions with leave to amend, particularly in cases where the motion is based on a pleading technicality."  In re Dynamic Random Access Memory Antitrust Litig., 516 F. Supp. 2d 1072, 1084 (N.D. Cal. 2007).

## IV.   ANALYSIS

Allianz offers two grounds for granting judgment on the pleadings in its favor. First, Allianz contends that the RICO claims of plaintiff Healey, and class members residing in at least sixteen states, are barred by the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., which "reverse-preempts" federal claims that "impair" state statutes

1
2
3
4
5

"regulating the business of insurance."  Second, Allianz argues that plaintiff Ow's claim of financial elder abuse under the California Elder Abuse and Dependent Adult Civil Protection Act ("Elder Abuse Act"), Cal. Welf. & Instit. Code § 15600 et seq., fails to plead an essential element of his claim—that he has suffered physical harm or pain or mental suffering as a result of the alleged abuse.  Each argument is addressed in turn.

6

### A.    Reverse-Preemption and the McCarran-Ferguson Act

7
8
9
10
11
12
13
14
15

In pursuit of the notion that "continued regulation and taxation by the several States of the business of insurance is in the public interest," Congress enacted the McCarran-Ferguson Act in 1945 to ensure that "silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."  15 U.S.C. § 1011; Humana Inc. v. Forsyth, 525 U.S. 299, 306 (1999).  A primary motivating concern for both representatives of the insurance industry and Congress in enacting the MFA "was that cooperative ratemaking efforts be exempt from the antitrust laws.'"  Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982) (quoting Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 221 (1979)).

16
17
18
19
20

At issue here is section 2(b) of the Act, which provides in relevant part that:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance. . . .

21
22
23
24
25

15 U.S.C. § 1102(b).  Under this section, state law preempts a federal statute if (1) "the federal law does not specifically relate to insurance"; (2) the purpose of the state enactment is to regulate the business of insurance; and (3) "the application of federal law to the case might invalidate, impair, or supersede the state law."  Ojo v. Farmers Group, Inc., 600 F.3d 1201, 1203 (9th Cir. 2010) (per curiam) (en banc).[1]  As a general rule,

26

---

27
28

[1] Other than the Ojo per curiam, en banc decision, which addressed whether the
continue...

6

"[w]hen federal law is applied in aid or enhancement of state regulation, and does not frustrate any declared state policy or disturb the State's administrative regime, the McCarran-Ferguson Act does not bar the federal action." <u>Humana</u>, 525 U.S. at 303.[2]

Neither party disputes that RICO does not specifically relate to the business of insurance. <u>See Humana</u>, 525 U.S. at 307. The question is thus whether a given state has enacted a law "for the purpose of regulating" the business of insurance that would be invalidated, impaired or superseded by allowing plaintiffs to pursue their RICO claims. As both parties focus on the impairment prong of section two, <u>Humana</u> supplies the controlling test: "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." <u>Id.</u> at 310. In adopting this test, "the Court rejected an implicit presumption against the application of federal law in insurance contexts, stating instead that federal law is to be applied in an insurance context where it can be applied in harmony with state law." <u>Dehoyos v. Allstate Corp.</u>, 345 F.3d 290, 294 (5th Cir. 2003).

_____

[1]...continue
federal Fair Housing Act, 42 U.S.C. §§ 3601–3619, is reverse-preempted by the Texas Insurance Code, the Ninth Circuit has not addressed the import of the Supreme Court's <u>Humana</u> decision on the application McCarran-Ferguson Act. Prior to <u>Humana</u>, the Ninth Circuit applied a four-factor test for preemption. <u>See Merchants Home Delivery Serv. v. Frank B. Hall & Co.</u>, 50 F.3d 1486, 1489 (9th Cir. 1995). In addition to the foregoing, this test asked whether a defendant's alleged conduct constitutes "the business of insurance." <u>Id.</u> Neither party argues that Allianz's alleged conduct is unrelated to the business of insurance, and therefore the remaining provisions of the McCarran-Ferguson Act must be considered here.

[2] The Court notes that "whether McCarran-Ferguson precludes a RICO claim is a question of federal law," <u>In re Nat'l Western Life Ins. Deferred Annuities Litig.</u>, 467 F. Supp. 2d 1071, 1079 (S.D. Cal. 2006), although resolution of this question depends on an interpretation of state laws regulating the insurance industry. <u>See also Weiss v. First Unum Life Ins. Co.</u>, 482 F.3d 254, 263 n. 6 (3d Cir. 2007).

1    In Humana, health insurance policyholders brought claims under RICO against
2   defendant Humana, alleging that the defendant had engaged in a scheme to defraud its
3   beneficiaries.  Pursuant to their contract with Humana, the policyholders bore
4   responsibility for paying only 20% of the hospital charges over a designated deductible,
5   and Humana the remaining 80%.  However, because of a concealed discount Humana
6   allegedly obtained from the hospital in question, Humana paid "significantly less" than
7   its contractual share and the beneficiaries paid significantly more.  Id. at 304.  A state
8   investigation of the alleged scheme led to a consent decree and a civil penalty.

9    Applying the impairment test noted above, a unanimous Supreme Court held that
10  the Nevada Unfair Insurance Practices Act ("NUIPA") would not be "impaired" by
11  allowing the policyholders to bring suit under RICO.  Id. at 312.  In reaching this
12  conclusion, the Court noted the various statutory and common law remedies that Nevada
13  had adopted to prohibit insurance fraud and misrepresentations.  In particular, not only
14  was the Nevada Insurance Commissioner given authority to bring charges for violations
15  of the NUIPA, the NUIPA also authorizes a private right of action for violations of a
16  number of unfair insurance practices, including misrepresentations about insurance
17  policy provisions relating to coverage.  Id.  Nevada also permits private rights of action
18  to be brought based upon breaches of common law duties, including the covenant of
19  good faith and fair dealing, and allows punitive damages that may exceed the treble
20  damages provided for under RICO.  Id. at 313.  Finally, the Court noted that Nevada
21  never urged during the course of the lawsuit that application of RICO "would frustrate
22  any state policy, or interfere with the State's administrative regime."  Id. at 313–14.
23  Accordingly, the Court held that the McCarran-Ferguson Act did not preclude the
24  plaintiffs' suit, because RICO "advance[d] the State's interest in combating insurance
25  fraud, and [did] not frustrate any articulated Nevada policy."  Id. at 314.[3]

26  _____

27      [3] Following Humana, a number of federal courts have adopted a "non-exclusive" list
28                                                                    continue...

There appears to be a divergence of views in the circuits as to the proper application of <u>Humana</u> where a state's insurance laws do not permit a private right of action based upon a particular claimed injury that forms the basis of a civil suit under federal law.  Whereas some courts have found the lack of a private right of action to be dispositive, others have held that where as a federal right of action does not frustrate a state's interests or unduly interfere with its administrative scheme, the federal claim is not barred by the McCarran-Ferguson Act.  Compare <u>LaBarre v. Credit Acceptance Corp.</u>, 175 F.3d 640, 643 (8th Cir. 1999) (holding RICO claim is reverse-preempted by Minnesota law where state did not provide a private right of action under its insurance code) <u>and</u> <u>Riverview Health Inst. LLC v. Med. Mut. of Ohio</u>, 601 F.3d 505, 517 (6th Cir. 2010) (holding that RICO claim impaired Ohio's insurance regulatory scheme based upon application of the "<u>Humana</u> factors" noted above), <u>with</u> <u>Weiss v. First Unum Life Ins. Co.</u>, 482 F.3d 254, 264 (3d Cir. 2007) (holding that RICO claim is not reverse-preempted by New Jersey law, despite lack of private right of action, in light of the factors noted above) <u>and</u> <u>BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.</u>, 194

---

[3]...continue

of factors for determining whether a federal law impairs a state law enacted for the purpose of regulating insurance.  See <u>Weiss v. First Unum Life Ins. Co.</u>, 482 F.3d 254, 261 (3d Cir. 2007); <u>Riverview</u>, 601 F.3d at 517.  These factors are:

(1) the availability of a private right of action under state statute; (2) the availability of a common law right of action; (3) the possibility that other state laws provided grounds for suit; (4) the availability of punitive damages; (5) the fact that the damages available. . . could exceed the amount recoverable under RICO, even taking into account RICO's treble damages provision; (6) the absence of a position by the State as to any interest in any state policy or their administrative regime; and (7) the fact that insurers have relied on RICO to eradicate insurance fraud.

<u>Weiss</u>, 482 F.3d at 261.  While the Court agrees that these factors may be useful indicia of the proper outcome under the McCarran-Ferguson Act, the Court is not persuaded that <u>Humana</u> requires the application of this framework in all cases.

F.3d 1089, 1099 (10th Cir. 1999) (holding that a RICO claim is not reverse-preempted by the Missouri Unfair Trade Practice Act, despite the lack of a private right of action under state law).[4]

The Court concludes that the better view is that articulated by the Third, Fourth, and Tenth Circuits—the absence of a private right of action under state insurance law is not dispositive as to whether there is reverse-preemption under the McCarran-Ferguson Act.  See In re Nat'l Western Life Ins. Deferred Annuities Litig., 467 F. Supp. 2d 1071, 1078 (S.D. Cal. 2006) (finding the same); Axiom Ins. Managers Agency, LLC v. Indem. Ins. Corp., No. 11-cv-2051, 2011 WL 3876947, at *9 (N.D. Ill. Sept. 1, 2011) (concluding that "unless a state's insurance regime establishes an exclusively administrative remedy, the fact that a state insurance statute does not permit a private cause of action does not preclude a plaintiff from bringing an action under a federal law of general applicability").  This conclusion best aligns with the Supreme Court's holding in Humana, because federal law may provide for a claim "in aid or enhancement of state regulation" even in those situations where a state does not provide for a private right of action.  525 U.S. at 303.[5]

---

[4] See also Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 169 (3d Cir. 2001) (finding no reverse-preemption of Lanham Act claims brought against an insurer under Pennsylvania law); Sabo v. Metropolitan Life Ins. Co., 137 F.3d 185 (3d Cir. 1998) (holding that RICO does not impair a state insurance law where private rights of action are permitted under other state laws); Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 232 (4th Cir. 2004) (holding that "RICO furthers Virginia's interest in policing insurance fraud and misconduct and does not frustrate any declared state policy," even in the absence of a private right of action).

[5] This conclusion is buttressed by the fact that the Supreme Court granted certiorari in Humana to consider whether "a federal law, which proscribes the same conduct as state law, but provides materially different remedies, 'impair[s]' state law under the McCarran-Ferguson Act."  Humana, 525 U.S. at 305.  As noted, the Court answered this question in the negative.  Moreover, as discussed by the Tenth Circuit, Humana rejected
continue...

Moreover, as numerous courts have noted, it is not enough simply to find that all "RICO claims" are reverse-preempted by the insurance laws of a particular state—Humana's "fact-intensive interpretation of the word 'impair'" requires a court to focus on "the precise federal claims asserted." Saunders v. Farmers Ins. Exch., 537 F.3d 961, 967 (8th Cir. 2008). A broadly-drafted federal statute, such as RICO, may impair state insurance laws in some circumstances but not in others, depending on the "theory of liability asserted and the relief sought by [the] plaintiffs." Id.; see also AmSouth Bank v. Dale, 386 F.3d 763, 781 (6th Cir. 2004) ("when assessing whether a general federal statute that creates a cause of action 'impairs' the operation of a state law, the proper inquiry is whether the particular suit being brought would impair state law"). With these principles in mind, the Court turns to the individual state insurance laws at issue on this motion.

### 1. Florida

Allianz argues that permitting plaintiff Healey and other members of the class residing in Florida to assert RICO claims against it will impair Florida's "comprehensive scheme" for regulating the insurance industry, in addition to "displacing" Florida's administration of its laws. See Fla. Stat. § 624.602(1).[6] Allianz reasons that the combination of state insurance laws that "closely regulate" the conduct that forms the basis of plaintiffs' claims, in conjunction with the absence of a private right of action under this state scheme, counsels in favor of a finding of reverse-preemption. See, e.g.,

_____

[5]...continue

the "upset the balance approach" of the Fourth, Sixth and Eighth Circuits, under which the provision of an additional or supplemental federal remedy could be said to "impair" the operation of the state's insurance scheme. See BancOklahoma, 194 F.3d at 1098–99 (discussing the circuit split prior to Humana).

[6] "Annuity contracts" are considered a form of life insurance under the Florida legislative scheme, and are therefore subject to regulation under the FUITPA. See Fla. Stat. § 624.602(1).

1  In re Managed Care Litig., 185 F. Supp. 2d 1310, 1322 (S.D. Fla. 2002).  This includes

2  the remedies provided for under RICO, which Allianz argues far exceed those available

3  under any provision of FUITPA, including treble damages and costs and attorney's fees

4  to prevailing parties.  Moreover, Allianz contends, permitting the Florida members of the

5  class to bring their RICO claims would impermissibly "displace" the administration of

6  Florida's insurance laws, which further "impairs" Florida's administration of its laws

7  and regulations.  See Doe v. Mut. of Omaha Ins. Co., 179 F.3d 557, 564 (7th Cir. 1999).

8  This includes the procedural limitations on private rights of action under Florida

9  insurance law, such as the notice requirement and safe harbor provision under section

10  624.155.  Allianz also argues that Florida courts categorically forbid class certification

11  of common law fraud claims based upon individual contracts or misleading advertising.

12  See Lance v. Wade, 457 So.2d 1008, 1011 (Fla. 1984); Rollins, Inc. v. Butland, 951

13  So.2d 860, 877–78 (Fla. Dist. Ct. App. 2006).

14        Having considered the pertinent aspects of Florida law, however, the Court

15  concludes that the claims of the class members residing in Florida are not reverse-

16  preempted under the McCarran-Ferguson Act.  The Florida Unfair Insurance Trade

17  Practices Act ("FUITPA"), Fla. Stat. §§ 626.951 et seq., provides a legislative scheme

18  for regulating the insurance industry.  The Act prohibits a variety of "unfair methods of

19  competition and unfair or deceptive acts," including misrepresenting or falsely

20  advertising "the benefits, advantages, conditions, or terms of any insurance policy."  Id.

21  § 626.9541(1)(a)(1).  In addition, the Florida Office of Insurance Regulation ("OIR")

22  has promulgated a number of regulations pursuant to its authority under the FUITPA.

23  / / /

24  / / /

25  / / /

26  / / /

27

28

See Fla. Admin. Code r. 69B-150.101 et seq.[7]  The stated purpose of these regulations is to:

> to provide prospective purchasers with clear and unambiguous statements in the advertisement of Life Insurance and Annuity Contracts, and to assure the clear, truthful and adequate disclosure of the benefits, limitations and exclusions of policies sold as Life Insurance and Annuity Contracts.

Id. r. 69B-150.101.[8]  The OIR rules prescribe particular methods for the disclosure of required information, Fla. Admin. Code r. 69B-150.104, and the form and content for advertisements of annuity products, mandating that any advertisement "shall be sufficiently complete and clear to avoid deception or the capacity or tendency to mislead or deceive," Fla. Admin. Code r. 69B-150.105(1); see also id. ("Advertisements shall be truthful and not misleading in fact or in implication").  Other regulations prohibit advertisements that (by omission or misrepresentation) have a "tendency or effect of misleading or deceiving. . . purchasers as to the nature or extent of any policy or contract benefit payable," or make any representation regarding the interest rate that is to be earned, "unless all limitations and conditions which affect the ultimate rate of return earned by the policyholder/insured/beneficiary are disclosed prominently and conspicuously."  Fla. Admin. Code r. 69B-150.107(1)(a), (j).  In addition to the foregoing, specific provisions apply to the advertisement of "indeterminate value"

---

[7] The parties do not address the issue of whether the Court should consider a state's administrative regulations, in addition to its statutory framework, in determining whether the RICO claim is reverse-preempted.  However, the Court need not reach this question, as the Court finds that the state's regulations are at a minimum evidence of the state's policy, which is relevant to the reverse-preemption analysis under Humana.

[8] "Advertisements" for purposes of these regulations includes a "notice, circular, pamphlet, letter, or poster" that is disseminated to the public, Fla. Stat. § 626.9541(1)(b), but does not include "[m]aterial to be used solely for the training and education of an insurer's employees, agents, or brokers" or other internal communications not directed at the buying public.  See Fla. Admin. Code r. 69B-150.103.

annuity contracts." These advertisements may not contain "rates of return or any other
designation of earnings performance" unless "all limitations and conditions which affect
the rate of return ultimately realized by the. . . annuitant are disclosed prominently [and]
with equal emphasis." Fla. Admin. Code r. 69B-150.106(1); see id. (noting that
disclosures must include, where applicable "premium expense charges," "administrative
charges," "surrender charge[s]," and "any other provisions which affect the rate of return
ultimately realized"). Moreover, no agent may effectuate any insurance coverage before
providing "a full explanation of the coverage offered" to the purchaser. Fla. Admin.
Code r. 69B-150.105(6).

Although plaintiffs' RICO claims are not based upon a violation of the FUITPA,
the Court notes that plaintiffs challenge an alleged course of conduct that is prohibited
by multiple provisions of FUITPA and its implementing regulations. In particular,
section 626.9541(1)(a)(1) of the Florida Code prohibits the very sort of
misrepresentation of "the benefits. . . conditions, or terms" in the advertising and
promotion of annuity contracts that plaintiffs challenge by way of this lawsuit. And the
various Florida regulations governing the sale of annuities prohibit the omission or
misrepresentation of material information in any advertising that has a "tendency or
effect" to mislead or deceive potential purchasers. See Fla. Admin. Code r. 69B-150.101
et seq. Therefore, as was the case in Humana, RICO complements or supplements the
state's legislative scheme, and the imposition of liability under RICO would not
necessarily subject Allianz to conflicting standards of conduct in its sale of insurance
products. See Humana, 525 U.S. at 313; see also Axiom, 2011 WL 3876947, at *9
(finding no reverse-preemption where, *inter alia*, the defendant's alleged actions "in
misrepresenting its capitalization to regulators and committing fraud to insurance rating
agencies would, if true, violate the Illinois statute."); N.A.A.C.P. v. Am. Family Mut.
Ins. Co., 978 F.2d 287, 297 (7th Cir. 1992) (noting that "state and federal rules that are
substantively identical but differ in penalty do not conflict with or displace each other").

In this fundamental sense, plaintiffs' RICO claims do not conflict with or impair any state enactment or substantive policy, but instead advance Florida's interest in combating fraud and deception in the annuities market.  Cf. In re Managed Care, 150 F. Supp. 2d 1330, 1339 (S.D. Fla. 2001) (noting that some of the states at issue in that litigation had statutes that appeared to permit the very practices that plaintiffs challenged by way of their RICO claims).

Moreover, the absence of a private right of action is but one factor in the Humana "impairment" analysis.  See, e.g., Weiss, 482 F.3d at 264 (holding that the absence of a private right of action is an "obstacle" to a plaintiff's claim, "but by no means an insurmountable one").  It is true that FUITPA provides private rights of action for certain violations but not others, and that none of the provisions for which a private right of action are provided address the use of misleading or fraudulent advertising and sales materials in the insurance industry.  See Buell v. Direct Gen. Ins. Agency, Inc., 267 F. App'x 907, 909 (11th Cir. 2008); Fla. Stat. § 624.155 (setting forth the specific provisions of the insurance code for which a civil action may be brought against an insurer); see also Fla Stat. § 626.9641 (setting forth a policyholder bill of rights, including "the right to insurance advertising and other selling approaches that provide accurate and balanced information on the benefits and limitations of a policy," but further stating that this section does not create a civil cause of action against an insurer).

Even in the absence of a statutory cause of action, however, plaintiffs would have a number of potential common law claims available to them, including claims for fraud, bad faith, and negligent misrepresentation.[9]  See Riverview, 601 F.3d at 517 (finding

_____

[9] Allianz notes the unavailability of claims under the "Florida RICO Act," for which FUITPA violations are not listed as a predicate act, see Fla. Stat. § 895.02(1)(a), and the Florida Deceptive and Unfair Trade Practices Act, which by its terms does not apply to the insurance industry, see Fla. Stat. § 501.212(4); Zarrella v. Pac. Life Ins. Co., 755 F. Supp. 2d 1218, 1226 (S.D. Fla. 2010).  In addition, it appears that parallel common law claims continue...

reverse-preemption where the "[p]laintiffs have no common law remedies available,

which renders Ohio's Prompt Pay Act [p]laintiffs' exclusive source of remedies"). The

FUITPA expressly preserves a plaintiff's right to assert these parallel common law

causes of action against an insurer. See Fla. Stat. § 626.9631 (stating that the provisions

of FUITPA "are cumulative to rights under the general civil and common law, and no

action of the department, commission, or office shall abrogate such rights to damages or

other relief in any court").[10]  A number of other courts, including the Supreme Court,

have noted the importance of these "preservation clauses" in their analysis of whether a

particular claim is reverse-preempted by the state's insurance laws. See Humana, 525

U.S. at 312 (noting that the Nevada insurance practices act "is not hermetically sealed; it

does not preclude the application of other state laws, statutory or decisional"); see also

Weiss, 482 F.3d at 264; Am. Chiropractic, 367 F.3d at 218; BancOklahoma, 194 F.3d at

1099.  There is no question that insureds in Florida have availed themselves of these

common law rights in suits against their insurers.  See, e.g., Zarrella v. Pac. Life Ins. Co.,

755 F. Supp. 2d 1218, 1226 (S.D. Fla. 2010) (fraud claim).

In addition, as in Humana, plaintiffs would have the right to seek punitive

damages under Florida law.  See Fla. Stat. § 768.72; Hialeah Automotive, LLC v.

---

[9]...continue

may not be based on an underlying violation of FUITPA, although Allianz cites scant case
law in support of this proposition.  See Keehn v. Carolina Cas. Ins. Co., 758 F.2d 1522,
1524 (11th Cir. 1985) (affirming district court opinion without discussion).  However, the
fact that remedies are not available under parallel statutory claims does not diminish the
fact that plaintiffs challenge alleged conduct that appears to be directly prohibited by
Florida law.

[10] Allianz notes that Florida courts have interpreted this provision to only "preserve
those causes of action that a party had available to him prior to the enactment of the Act."
Cycle Dealers Ins., Inc. v. Bankers Ins. Co., 394 So.2d 1123, 1125 (Fla. Dist. Ct. App.
1981).  However, the fact that plaintiffs may bring common law claims for the conduct at
issue in this action, regardless of the availability of the savings clause, is what supports
plaintiffs' ability to bring their RICO claims here.

Basulto, 22 So.3d 586, 590 (Fla. Dist. Ct. App. 2009) ("punitive damages are available
in judicial proceedings where there is a fraud claim").  This mirrors the treble damages
that are available to prevailing plaintiffs under RICO.  Thus, RICO's treble damages
provision appears to complement, rather than impair, the Florida regulatory scheme for
insurance fraud and deceptive practices.  See Humana, 525 U.S. at 313.[11]  Allianz is also
unable to point to any pronouncement by the state of Florida at any stage of this
litigation (or other litigation) against the application of RICO to allegations such as
plaintiffs' allegations here.  This factor also weighs against a finding of reverse-
preemption.

Allianz relies on In re Managed Care Litig. for the proposition that the RICO
claims brought by Florida citizens are reverse-preempted by Florida law.  In that case,
the district court found that the RICO claims of plaintiffs from California, New Jersey,
Virginia, and Florida were reverse-preempted by the McCarran-Ferguson Act.
However, the Court finds that this case is distinguishable on numerous grounds.  First,
Managed Care involved an alleged scheme to defraud subscribers to managed care
organization ("MCO") plan, where the plaintiffs alleged that the MCO defendants used
various monetary incentives to influence their doctors, misapplying the term "medical
necessity," and including "gag clauses" that prohibited doctors from communicating
with their patients about certain proprietary information regarding the MCO operating

---

[11] Allianz's reliance on the Florida state court decisions in Lance and Rollins is
misplaced.  Even assuming that a plaintiff's ability to bring class actions under state
common law is relevant, Lance and the cases that follow it stand for the proposition that
"claims for fraud based on individual contracts cannot be the basis for a class action" under
Florida procedural law.  Rollins, 951 So.2d at 877 (citing Lance, 457 So.2d at 1011).
Rollins distinguished cases such as Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004),
where "because of the nature of the misrepresentations at issue in that case, circumstantial
evidence could be used to show that reliance was common to the whole class." 951 So.2d
at 879.  As the Court has already found, plaintiffs here could demonstrate reliance through
circumstantial evidence that is common to the class, as in Klay.  As such, Lance is
distinguishable from the instant case.

structure.  Id. at 1316–17.  Unlike Allianz's alleged conduct here, much of the defendants' alleged conduct in Managed Care may have been permissible under the insurance schemes of the states at issue.  See In re Managed Care, 150 F. Supp. 2d  at 1339 (noting that "[d]efendants identify statutes from California, Florida, Oklahoma and Texas which permit certain cost-containment processes by insurance companies").  This apparent conflict between the requirements of the state insurance regulatory scheme and the plaintiffs' claims in Managed Care supports a much stronger inference of impairment than the instant case, where plaintiffs seek to impose duties on Allianz that are analogous to those contemplated by the relevant state law.

Second, Managed Care's reasoning and its conclusions have been called into doubt by a number of more recent cases, most prominently by decisions of the Third and Fourth Circuit, which found that a plaintiff's RICO claims were not reverse-preempted by the insurance laws of New Jersey or Virginia, respectively.  See Weiss, 482 F.3d at 269 ("we are left with the firm conviction that RICO does not and will not impair New Jersey's state insurance scheme"); Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 232 (4th Cir. 2004) ("RICO furthers Virginia's interest in policing insurance fraud and misconduct and does not frustrate an declared state policy"); see also In re Nat'l Western, 467 F. Supp. 2d at 1079 (finding no reverse-preemption under California law).  More fundamentally, Managed Care relied heavily on decisions such as Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 151 F. Supp. 2d 723, 735 (W.D. Va. 2001), a decision that was vacated on appeal in relevant part by the Fourth Circuit, for the proposition that the absence of a private right of action under a state insurance scheme is dispositive under the McCarran-Ferguson analysis.  Indeed, the Managed Care court evidently placed significant weight on this factor.  But because this interpretation of Humana has since been rejected by nearly every court to consider the issue, the Court finds that Managed Care is not persuasive here, particularly in the absence of any conflict between the commands of state and federal law.

18

The unpublished decisions in <u>Weinstein v. Zurich Kemper Life</u>, No. 01-cv-6140, 2002 WL 32828648 (S.D. Fla. Mar. 15, 2002) and <u>Braunstein v. Gen. Life Ins. Co.</u>, No. 01-cv-6040, 2002 WL 31777635 (S.D. Fla. Nov. 19, 2002) are also distinguishable. Both of these cases involved apparently identical schemes to defraud, as the plaintiffs alleged that the defendants were engaged in a "scheme of collecting life insurance premium payments for periods of time during which the [d]efendants were not providing insurance." <u>Weinstein</u>, 2002 WL 32828648, at *1; <u>Braunstein</u>, 2002 WL 31777635, at *1. Both courts found that this alleged conduct appears to be forbidden by the FUITPA. <u>See</u> Fla. Stat. § 626.9541(o)(1) (prohibiting an insurer from "[k]nowingly collecting any sum as a premium or charge for insurance, which is not then provided"). Unlike the instant case, Florida law does provide a private right of action for violations of this subsection, <u>see</u> Fla. Stat. § 624.155(1)(a)(1), albeit a right of action that has certain accompanying procedural limitations, including a pre-suit notice requirement and a prohibition on class actions, <u>see</u> Fla. Stat. § 624.155(3), (6). As such, both courts concluded that "[t]hese limitations are the declared state policy in Florida on suing insurance companies for unfair or deceptive trade practices, *of the type alleged in this case*, pursuant to Fla. Stat. § 626.9541(1)(o)." <u>Braunstein</u>, 2002 WL 31777635 at *4 (emphasis added). However, there is no private right of action under Florida law for violations of Fla. Stat. § 624.9541(1)(a) and its accompanying regulations, which prohibit misrepresentations and false advertising of insurance policies, the type of unfair and deceptive trade practices alleged in this case. As such, there is no "declared state policy" as to the proper procedural limitations for the types of claims alleged in this case, unlike the RICO claims at issue in <u>Braunstein</u> and <u>Weinstein</u>. These cases are further distinguished from the instant one because these courts ignored possible common law claims that a plaintiff could bring challenging the same alleged conduct, and the

plaintiffs' claims in those cases sounded in breach of contract, not fraud.[12]  Because even

the absence of a private right of action is not dispositive under Humana, the Court finds

that procedural limitations on any private rights of action do not necessarily counsel in

favor of reverse-preemption of a RICO claim, where plaintiffs' claims are premised

upon a materially different sort of allegedly unfair and deceptive insurance practices.[13]


       For all of the foregoing reasons, the Court concludes that the prosecution of RICO

claims on behalf of Florida class members would not impair Florida's scheme for

regulating insurance.  The Court is of the view that the Ninth Circuit would most likely

follow the Third Circuit's approach in Weiss, which best conforms with the principles

---

[12] These courts did consider the import of the former Fla. Stat. § 624.155(7), now set
forth in section 624.155(8), which provides that:

> The civil remedy specified in this section does not preempt any other remedy or
> cause of action provided for pursuant to any other statute or pursuant to the common
> law of this state.  Any person may obtain a judgment under either the common-law
> remedy of bad faith or this statutory remedy, but shall not be entitled to a judgment
> under both remedies. This section shall not be construed to create a common-law
> cause of action.

Id.  Both courts determined that this section allows for other remedies under Florida
statutory and common law, but not under Federal law.  See Braunstein, 2002 WL
32828648, at *5–7.  Neither of these decisions discusses Fla. Stat. § 626.9631, the
preservation clause discussed previously, nor potential common law fraud claims.

[13] Moreover, Bristol Hotel Mgmt. Corp. v. Aetna Cas. & Sur. Co., 20 F. Supp. 2d
1345 (S.D. Fla. 1998), predates Humana and is factually distinguishable.  There, the
plaintiffs' allegations implicated not only Florida's unfair insurance practices regulatory
scheme, but also its "comprehensive" workers' compensation framework.  See id. at 1351.
As such, the court concluded that the plaintiffs' claims would impair these dual regulatory
regimes.

20

articulated by the Supreme Court in <u>Humana</u>.[14]  Nothing in the Florida regulatory scheme compels the conclusion that the application of RICO here would interfere with the state's administrative regime or frustrate any declared state policy.  Although Florida's regulation of the insurance industry is extensive, plaintiffs' RICO claims complement, rather than impair, the parallel regulatory scheme under Florida law, which prohibits the same sort of alleged misrepresentations and omissions allegedly at issue here.

The Court further notes that RICO "embodies federal policies of an expansive nature. . .[and] [t]he need for this type of regulation was not contemplated when McCarran-Ferguson was enacted."  <u>Weiss</u>, 482 F.3d at 268; <u>see</u> <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 498 (1985) (describing RICO as "an aggressive initiative to supplement old remedies").  Plaintiffs claim to have suffered injury as a result of an alleged nationwide scheme to defraud seniors, carried out through a pattern or practice of racketeering activity by a "Senior Annuity Enterprise" consisting of Allianz and its affiliated or subsidiary Field Marketing Offices.  These allegations, if proven, amount to more than a mere violation of the Florida insurance statutes and regulations at issue, but define an organized syndicate formed for the common purpose of defrauding seniors nationwide.  In this sense, RICO advances—not impairs—Florida's interest in combating insurance fraud, by providing federal remedies for a particular sort of alleged conduct by an enterprise.  <u>Cf.</u> <u>Agency Holding Corp. v. Malley-Duff & Assoc., Inc.</u>, 483

---

[14] In <u>Ojo</u>, the Ninth Circuit certified the question of whether Texas insurance law prohibited the use of credit-score factors to the Texas Supreme Court, noting that "if Texas law prohibits the use of credit-score factors that could violate the [Fair Housing Act] on the basis of a disparate-impact theory, then the FHA would complement—rather than displace and impair—Texas law, and Ojo's FHA disparate-impact suit would not be reverse-preempted by the MFA."  <u>Ojo v. Farmers Group, Inc.</u>, 600 F.3d 1201, 1204 (9th Cir. 2010) (per curiam) (en banc).  This reasoning supports plaintiffs' argument that application of RICO here will complement, rather than impair, the Florida scheme for regulating insurance carriers.

U.S. 143, 153–154 (1987) (noting the "sui generis" nature of a RICO claim, which requires a nexus to interstate commerce and "the allegation of a *pattern* of racketeering").  As such, courts "should be wary of underestimating the significance of these federal policies and should not go out of [their] way to find impairment of a state scheme when such impairment is not clear." <u>Weiss</u>, 482 F.3d at 268.

In sum, the important federal policies supporting the imposition of RICO liability must be balanced against those supporting state autonomy in the regulation of the insurance industry contemplated by the McCarran-Ferguson Act.  Weighing that balance here, the Court concludes that the particular RICO claims that plaintiffs seek to bring here—based on fraud allegations in the sale of annuity products—will not impair Florida's legislative and administrative regulatory scheme.  The McCarran-Ferguson Act is not designed to "preclude federal regulation merely because the regulation imposes liability additional to, or greater than, state law." <u>Humana</u>, 525 U.S. at 309.

### 2.    Other States

The Court turns next to the states of Alabama, Alaska, Arkansas, Kansas, Michigan, Mississippi, New Hampshire, Oklahoma, Oregon, South Carolina, Vermont, and Wisconsin.  Similar to its arguments with respect to the state of Florida, Allianz offers a number of reasons why RICO claims are reverse-preempted in each of the foregoing states.  First, Allianz argues that all of these states regulate unfair and deceptive practices in the insurance industry, but none of these states provides a private right of action to challenge deceptive practices.  Second, Allianz contends that some of these states have an administrative hearing process or vest certain enforcement powers in the state's insurance commissioner, and these administrative schemes would be impaired by plaintiffs' claims.[15]  Third, Allianz notes that plaintiffs in these states would be

_____

[15] This includes the states of Alaska, Kansas, New Hampshire, and Ohio.  New Hampshire does provide for a private right of action under its Unfair Insurance Trade

continue...

unable to assert any state law statutory claims, whether under a given state's racketeering and corrupt practices statute, if a state has one, or under a general consumer protection statute.

Having reviewed the relevant laws in these states, the Court concludes that none of the RICO claims brought by residents of these states is barred by the McCarran-Ferguson Act, for substantially the same reasons as those articulated with respect to the state of Florida above.  Like Florida, all of these states have laws and regulations that prohibit unfair and deceptive practices in the insurance industry, the same conduct that forms the basis of plaintiffs' allegations in this case.  See, e.g., Ala. Admin. Code r. 482-1-132-.06(2) (prohibiting "misleading or deceiving. . . prospective purchasers as to the nature or extent of any policy benefit payable, loss covered, [or] premium payable"); Alaska Admin. Code tit. 3 § 26.755(a), (g)(3)–(4) (requiring various disclosures at the time of sale, including an explanation of potential fees and any applicable bonus rate);[16] Ark. Admin. Code 054.00.99-5 & -6 ("Advertisements shall be truthful and not misleading in fact or by implication"); Kan. Stat. § 40-2404 (prohibiting the use of any advertising that is misleading as to "the benefits, advantages, conditions or terms of any insurance policy"); Mich. Comp. Laws § 500.2005 (prohibiting misrepresenting "the terms, benefits, advantages, or conditions of an insurance policy"); Miss. Code § 83-5-35 (prohibiting misrepresentations and false advertising of insurance policy contracts); N.H. Rev. Stat. Ann. § 417:4 (prohibiting false or misleading representations in the

---

[15]...continue

Practices Law, N.H. Rev. Stat. § 417:1 et seq., but only where the Insurance Commissioner finds that an insurer has violated the trade practices law.  Ohio's administrative scheme is discussed infra.

[16] As of 2009, Alaska's regulations also ban the use of "senior-specific certification or professional designation in a manner that could mislead a purchase or prospective purchaser to believe that the insurance producer has special certification or training in advising or servicing seniors in the connection with the solicitation . . . or purchase of a life insurance or annuity product. . . ."  Alaska Admin Code tit. 3, § 26.825(a).

business of insurance); Okla. Admin. Code § 365:10-3-33 (prohibiting the omission of material information or the use of "words, phrases, statements, references or illustrations if such omission or such use has the capacity, tendency or effect of misleading or deceiving purchasers or prospective purchasers as to the nature or extent of any policy benefit payable"); Or. Rev. Stat. § 746.075 (prohibiting misrepresenting the terms of a policy in the sale of insurance); S.C. Code Ann. § 38-57-40 (prohibiting misrepresentations or false advertisements in the sale of insurance policies); Vt. Stat. Ann. tit. 8, § 4724 (prohibiting any statement that "misrepresents or fails to adequately disclose the benefits, advantages, conditions, exclusions, limitations, or terms of any insurance policy"); Wisc. Stat. Ann. § 628.347 (setting forth various "suitability" requirements in annuity transactions, including a requirement that a potential consumer be "reasonably informed" about various policy provisions); Wisc. Admin. Code Ins. § 2.16 (setting forth extensive requirements for the form and content of advertisements and deceptive practices in life insurance and annuities).  Accordingly, as with Florida, it appears that plaintiffs' RICO claims would not conflict with or impair any state enactment or substantive policy, but instead advance these states' respective interests in combating fraud and deception in the annuities market.[17]  This weighs strongly against a finding of reverse-preemption of plaintiffs' RICO claims.

---

[17] Moreover, the fact that the insurance commissioner in some of these states is granted various enforcement powers to enforce these laws and regulations does not demonstrate the existence of a state policy or administrative regime that would be impaired by plaintiffs' RICO claims here.  Many of these laws are modeled after the Unfair Trade Practices Act, crafted by the National Association of Insurance Commissioners and discussed by the Supreme Court in Humana.  See 525 U.S. at 311–12 (citing 4 National Association of Insurance Commissioners, Model Laws, Regulations and Guidelines 880-1 (1995)).  In this model law, section nine provides that any penalties imposed by the insurance commissioner shall not "in any way relieve or absolve any person affected by such order from any liability under any other laws."  This lends further support to plaintiffs' position that states that adopted the model law, including this or similar provisions, did not intend to eliminate other potential claims against insurers.

In addition, like members of the class who purchased their annuities in Florida, plaintiffs would have various common law claims available to them in all of these states, including claims for fraud, bad faith, and negligent misrepresentation.  And a plaintiff pursuing one of these common law claims could potentially obtain punitive damages.  Although a plaintiff in one of these states may be unable to base a common law claim on a violation of one of these states' unfair and deceptive insurance practices act, there is an independent common law duty in all of these states not to commit fraudulent acts.  Accordingly, as discussed above with respect to Florida, the existence of these parallel common law claims weighs against a finding of reverse-preemption for all of these states.

And as with Florida, almost all of these states have a preservation provision in their insurance code, which expressly preserves the rights of policyholders and insurance commissioners to pursue other remedies under statutory or common law.  See Ala. Code § 27-12-18(h) (providing that any order of the insurance commissioner does not "absolve any person affected by such order from any other liability, penalty, or forfeiture under law"); Alaska Stat. § 21.36.930 ("The powers vested in the director by this chapter are in addition to any other powers to enforce penalties, fines, or other forfeitures authorized by law with respect to acts and practices declared in this chapter to be unfair or deceptive."); Ark. Code Ann. § 23-66-212(d) (providing that no one shall be absolved of any other "liability under any laws of this state"); Kan. Stat. Ann. § 40-2408(b) (same); Mich. Comp. Laws § 500.2050 (providing that the provisions of the trade practices act are "in all respects cumulative of and supplemental to the insurance code and all other applicable Michigan statutes or common law"); Miss. Code Ann. § 83-5-43(4) ("No order of the commissioner. . . shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this state."); N.H. Rev. Stat. Ann. § 417:5-a (providing that the provisions of the act are "in all respects cumulative of and supplemental to the insurance code and all other applicable New

Hampshire statutes and common law"); Or. Rev. Stat. § 731.252 ("[n]o order of the

Commissioner. . . shall in any way relieve or absolve any person affected by such order

from liability under any other laws of this state"); S.C. Code Ann. § 38-2-10 (noting that

penalties for violating the insurance laws of the state are additional to, and do not

preclude, other proceedings); Vt. Stat. Ann. tit. 8, § 4726(c) ("powers vested in the

commissioner . . . shall be in addition to any other powers to enforce any penalties, fines,

or forfeitures authorized by law").[18]

       While some of these provisions appear to be addressed to the powers of insurance

commissioners to bring other enforcement proceedings, this does not end the inquiry.

Regardless of the precise language of a state's preservation provision, neither party

contends that any of these states has created an exclusive administrative regime for the

regulation of unfair or deceptive practices in the insurance industry.  Instead, it appears

that "although [a particular state] may limit certain statutory remedies for certain claims

under its insurance code, [each of these states] still provides for a robust policy in favor

of vindicating the rights of private plaintiffs damaged by an insurer's unlawful conduct."

In re Nat'l Western, 467 F. Supp. 2d at 1079.  As such, the Court finds that the absence

of a preservation clause for Wisconsin is not dispositive of the reverse-preemption

question.  Allianz has identified no "declared" Wisconsin policy that would be

frustrated, nor how the Wisconsin administrative regime would be unduly "interfere[d]"

with by a plaintiff's claim under RICO.  See Humana, 525 U.S. at 310; Weiss, 482 F.3d

at 269.  Rather, as with the other states discussed thus far, the particular RICO claims

that plaintiffs seek to bring here would not impair any declared Wisconsin policy,

_____

       [18] Allianz's argument that the phrase "laws of this state" refers only to other state
laws, not federal ones, is beside the point.   As noted by the Tenth Circuit in
BancOklahoma, the proper inquiry is whether a plaintiff may bring other causes of action
under state law, not whether a state expressly carves out a plaintiff's ability to bring federal
claims.  194 F.3d at 1099.

because plaintiffs' claims would advance the state's interest in combating alleged insurance fraud.[19]

The three remaining states at issue on this motion are Minnesota, Nebraska, and Ohio.  As to the states of Minnesota and Nebraska, Allianz contends that the Eighth Circuit's decision in LaBarre controls this case.  In LaBarre, the plaintiff alleged that she purchased a used car pursuant to a retail installment contract, where the purchase was assigned to one defendant, CAC.  "[T]he contract specifically required the purchaser to maintain insurance on the vehicle against property damage until the loan was repaid in full."  LaBarre v. Credit Acceptance Corp., 11 F. Supp. 2d 1071, 1073 (D. Minn. 1998).[20]  To fulfill this requirement, a purchaser could either obtain this insurance on her own, or instead from CAC as part of the financing package.  Id.  The plaintiff opted to purchase the required limited physical damage (LPD) insurance through CAC, which in turn had contracted with two insurers, Bankers and First Lenders, for a vendor single interest (VSI) insurance policy covering losses in any of CAC's financed vehicles.  Rather than separately obtaining LPD insurance, therefore, CAC "simply billed [the

---

[19] Allianz's citation to Pearson v. Provident Life and Acc. Ins. Co., 834 F. Supp. 2d 1199 (D. Or. 2004), is unpersuasive.  The plaintiff in Pearson brought a number of claims for relief, including RICO, based on a denial of his disability claim by the defendant insurer.  Id. at 1201–02.  Unlike plaintiffs here, the district court found that the plaintiff's allegations essentially amounted to a breach of contract claim related to the denial of benefits under the terms of his policy.  The court concluded that plaintiff had no common law claims for fraud or bad faith against his insurer, and found that allowing him to pursue his RICO claim would impair the state's legislative scheme for regulating insurance, as the plaintiff's claims may have conflicted substantively with the relevant provisions of Oregon law.  Id. at 1204–05.  These factual allegations are markedly different from plaintiffs' allegations here, as discussed throughout this order.  Accordingly, the Court finds that Pearson does not resolve whether the particular RICO claims plaintiffs seek to bring here are reverse-preempted by Oregon law.

[20] As this case was decided at the motion to dismiss stage, the Court adopts in part the summary of plaintiff's allegations contained in the district court's order that was affirmed in relevant part on appeal.

plaintiff] for its VSI insurance coverage on [her] car." <u>LaBarre</u>, 175 F.3d at 642.  The installment contract expressly advised consumers that "LPD Insurance . . . is primarily designed to fulfill the insurance requirement in your contract and to protect CAC."  11 F. Supp. 2d at 1074.  In support of her RICO claim, the plaintiff alleged that the defendants engaged in a scheme to defraud by unlawfully requiring consumers "to secure limited property damage insurance."  <u>Id.</u>  The plaintiff further alleged that the defendants defrauded purchasers by obtaining VSI insurance for CAC, rather than the LPD insurance that purchasers had contracted for.  175 F.3d at 642.  Notably, the plaintiff did not bring any claims sounding in fraud other than her RICO claim, asserting only claims for interference with contract by all the defendants; breach of contract by CAC; violations of the Minnesota Motor Vehicle Retail Installment Sales Act ("MVRISA") by CAC; and breach of fiduciary duty by CAC.  11 F. Supp. 2d at 1074.

The Eighth Circuit, agreeing with the Minnesota district court below, held that the plaintiff's RICO claim against the two insurers was reverse-preempted by the McCarran-Ferguson Act.  The court, relying largely on its decision in <u>Doe</u> that predated the Supreme Court's decision in <u>Humana</u>, concluded that the alleged "activities of [the insurers] in scheming to sell [the plaintiff] higher-priced VSI insurance rather than LPD insurance are governed by Minnesota's insurance law."  <u>Id.</u> at 643 (citing Minn. Stat. § 72A.20, the Minnesota Unfair Trade Practices Act ("MUTPA")).  Because Minnesota law "permits only administrative recourse for violations of § 72A.20," the court found that the application of RICO against the insurer-defendants would impair Minnesota's scheme for regulating insurance.  <u>Id.</u> (citing <u>Doe v. Norwest Bank Minnesota, N.A.</u>, 107 F.3d 1297, 1303–04 (8th Cir. 1997)).  The court did not address whether the plaintiff would have any common law claims available to her against the insurers, or any claims under the Minnesota Prevention of Consumer Fraud Act ("MPCFA"), Minn. Stat. §§ 325F.68–.70, which provides for private rights of action to enforce its provisions. <u>See</u> <u>Mooney v. Allianz Life Ins. Co. of North America</u>, No. 06-cv-545, 2007 WL

128841 (D. Minn. Jan. 12, 2007) (asserting claims against Allianz under Minnesota law, including the MPCFA, on behalf of a class of annuities purchasers).[21]  Both the Eighth Circuit and the district court appeared to conclude that plaintiff would have no claim available to her under any Minnesota law against the insurers, statutory or otherwise. See 11 F. Supp. 2d at 1075 (stating that if plaintiff has such a claim, "it is covered by Minnesota's comprehensive insurance regulatory scheme set forth in the [MUTPA]).[22] The district court thus dismissed all of the plaintiff's other claims against the insurers for failure to state a claim, and the Eighth Circuit affirmed this dismissal on appeal.  175 F.3d at 644.[23]

Notwithstanding LaBarre, this Court is of the view that its analysis set forth above for the other states at issue applies equally to the question of reverse-preemption under Minnesota and Nebraska law, and accordingly, the Court concludes that the RICO claims of plaintiffs who purchased their annuities in these states are not reverse-preempted.  Unlike the plaintiff's RICO claims in LaBarre, for which there was apparently no cause of action available under Minnesota law, plaintiffs here would

---

[21] In particular, Minnesota Statute section 8.31, subdivision 3a, provides that "any person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements."  One of the laws referenced in "subdivision 1" is "the Prevention of Consumer Fraud Act (sections 325F.68 to 325F.70)."  Section 325F.69, in turn, prohibits "the act, use or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise . . . ."

[22] See also id. at 1073 (expressing the court's view that "[t]he plaintiff has decided that the defendants have violated various laws").

[23] The Eighth Circuit did find, however, that the plaintiff's RICO claim against CAC, a financial  services company, could proceed, holding that "CAC's alleged activities are not governed by Minnesota's insurance statutes and do not involve the business of insurance within the meaning of the McCarran-Ferguson Act."  175 F.3d at 643 (citations omitted).

potentially have a private right of action under the MPCFA, as shown by the plaintiffs' claims in the <u>Mooney</u> litigation.  Moreover, as with the other states at issue, plaintiffs could bring common law fraud claims against Allianz centered around the same allegations that comprise their RICO claims.  Cf. <u>Saunders v. Farmers Ins. Exch.</u>, 537 F.3d 961, 968 (8th Cir. 2008) (finding reverse-preemption where the "right not to pay 'unfairly discriminatory' insurance rates is solely a creature of the insurance statutes").  Thus the fact that there is no private right of action for violations of Minn. Stat. § 72A.20 is not dispositive here, where plaintiffs would have numerous other private rights of action available to them under Minnesota law.  For these reasons, plaintiffs' RICO claims—unlike those asserted in <u>LaBarre</u>—would not "impair" the Minnesota scheme for regulating insurance.

Similarly, Nebraska has adopted the Nebraska Consumer Protection Act ("NCPA"), which provides in relevant part that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.  Neb. Rev. Stat. Ann. § 59-1602.  A private right of action for violations of the NCPA is provided in section 59-1609.  Therefore, although the Nebraska Unfair Insurance Trade Practices Act, Neb. Rev. Stat. Ann. §§ 44-1521 to 44-1535, does not contain a private right of action, plaintiffs here presumably have a parallel statutory right of action available to them under the NCPA, in addition to common law claims for fraud.[24]  Accordingly, the Court finds that as with the other states addressed in this motion, the claims of class members who purchased their annuities in Nebraska and Minnesota are not barred by the McCarran-Ferguson Act.

_____

[24] Allianz's citation to <u>Wineinger v. United Healthcare Ins. Co.</u>, No. 99-cv-141, 2000 WL 1277629, at *7 (D. Neb. Feb. 16, 2000), is unpersuasive.  <u>Wineinger</u> relied on <u>LaBarre</u> for the proposition that "lack of a private cause of action" under the insurance laws in particular was dispositive under the McCarran-Ferguson analysis.  As the Court finds this reading of <u>LaBarre</u> unpersuasive, the Court declines to follow <u>Wineinger</u>.

In addition, the Court finds that the RICO claims of class members who purchased their policies in Ohio are not reverse-preempted by the McCarran-Ferguson Act. The Sixth Circuit's decision in <u>Riverview</u> dealt with a different section of the Ohio insurance code that is part of Ohio's Prompt Pay Act, "which regulates the timely processing and payment of insureds' healthcare claims." 601 F.3d at 516 (citing Ohio R.C. §§ 3901.38–3901.3814). There is no private right of action to enforce the terms of this statute, but an aggrieved party may avail themselves of an administrative hearing process. <u>See</u> Ohio R.C. § 3901.3812 (providing for administrative hearings before the insurance commissioner). Addressing the same factors as the Third Circuit in <u>Weiss</u>, the court concluded that the lack of a private right of action, coupled with the "exclusive" nature of Ohio's administrative hearing procedure under the Prompt Pay Act, weighed in favor of reverse-preemption. Crucially, the court also noted the inability of the plaintiffs to bring a common law claim premised upon the same allegations, as the wrongs the plaintiffs complained of arose from duties that were created only by Ohio statute.[25] In addition, the State of Ohio filed an amicus brief arguing that plaintiffs' RICO claim was barred by Ohio law, reasoning that the administrative process governing the Prompt Pay Act should not be circumvented through the use of RICO. Because of the absence of a private right of action or any other cause of action under state law, the court reasoned that permitting plaintiffs' to bring their RICO claim would allow an end-run around the fundamental requirement of administrative exhaustion.

Plaintiffs' allegations here concern conduct that is governed by Ohio Revenue Code § 3901.21, which defines unfair and deceptive practices under Ohio law in a similar manner to those regulatory schemes already considered in this order. The Ohio Insurance Department has also promulgated regulations that address a number of specific practices in the sale of annuity products. <u>See, e.g.</u>, Ohio Admin. Code

---

[25] As such, the plaintiffs in <u>Riverview</u> were also unable to obtain any punitive damages.

31

§ 3901-6-13 ("Suitability in annuity transactions").  As with the Prompt Pay Act, the section covering unfair and deceptive practices in the insurance industry also contains an administrative hearing mechanism, whereby the commissioner may determine that a particular insurance practice is prohibited under Ohio law.  See Ohio R.C. § 3901.22 (setting forth administrative procedure for violations of the unfair practices provision).  Notably, however, the Ohio unfair practices law does not purport to set forth an exclusive administrative remedy; and unlike claims encompassed by the Prompt Pay Act, an Ohio plaintiff would still have traditional common law remedies available to him or her, including the potential for punitive damages.  As with the regulatory schemes of the other states considered in this motion, plaintiffs' RICO claims are based upon allegations that, if true, could constitute violations of the relevant Ohio statutes and regulations.  Moreover, the state's concern with preserving the integrity of its administrative process, as articulated as an amicus in Riverview with respect to the Prompt Pay Act, would not be implicated here to the same degree.  And there is no dispute that parallel common law claims remain available to plaintiffs in Ohio, without regard to whether a plaintiff has exhausted all available administrative remedies.[26]  Because this key factor distinguishes the instant case from Riverview, the Court concludes that Riverview does not dictate the outcome of the class members' claims who

_____

[26] Triggering the administrative hearing process under the Prompt Pay Act also requires a greater showing than under the unfair and deceptive practices section of the Ohio Code, further demonstrating the Ohio legislature's intent to limit remedies under this Act. Section 3901.3812 is only triggered "after completion of an examination involving information collected from a six-month period, [where] the superintendent finds that a third-party payer has committed a series of violations that, taken together, constitutes a consistent pattern or practice" of violating the Prompt Pay Act.  By contrast, section 3901.22 does not have this requirement of a pattern or practice of unfair and deceptive practice violations over a six-month period to trigger potential administrative review.

purchased their annuities in Ohio.[27]  Accordingly, for all of the reasons discussed herein, the Court finds that Ohio insurance law does not reverse-preempt the claims of any class member.

**B.     Elder Abuse Act Claim**

The California Elder Abuse Act makes additional damages available to a prevailing plaintiff who proves abuse of an elder, or a person age 65 years or older.  The Act defines various acts as "abuse of an elder," including "[p]hysical abuse, neglect, financial abuse, abandonment, isolation, abduction, or other treatment with resulting physical harm or pain or mental suffering."  Cal. Welf. & Instit. Code § 15610.07(a).  Each of these types of elder abuse is further defined elsewhere in the Act.

At issue here is alleged "financial abuse," which occurs when a person or entity "takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both."  Id. § 15610.30(a)(1).  The taking or retaining of property for "wrongful use" is further defined as a taking of property where the person or entity "knew or should have known that this conduct is likely to be harmful to the elder."  Id. § 15610.30(b).  And "taking" is defined as depriving an elder of any real or personal property by a number of means, including "by means of an agreement."  Id. § 15610.30(c).  The Act also makes it illegal for a person or entity to "assist" in any of the foregoing acts of abuse.  Id.  A plaintiff who proves "by a preponderance of the evidence that a defendant is liable for financial

---

[27] Allianz's citation to Shields v. Unumprovident Corp. is similarly unpersuasive. No. 05-cv-744, 2008 WL 8713740, at *2 (S.D. Ohio Jan. 17, 2008).  As with the Pearson case discussed previously, the plaintiffs' claims in Shields arose out of the denial of their claims for workers' compensation benefits, a field that is regulated by both ERISA, the Ohio workers' compensation system, and Ohio law concerning the setting of insurance rates.  See id. at *5, *7 (discussing ERISA and Ohio R.C. § 3937.04).  The court did not discuss whether any common law claims were potentially available to the plaintiffs.  As such, the court's conclusion that RICO is reverse-preempted by Ohio law does not aid the Court in its determination here.

abuse, *as defined in Section 15610.30*," may obtain reasonable attorney's fees and costs. Cal. Welf. & Instit. Code § 15657.5(a) (emphasis added).[28]

Allianz contends that it is entitled to judgment in its favor on plaintiff Ow's claim for violation of the Elder Abuse Act, made on behalf of the California class, because plaintiff has failed to allege that Allianz's purported financial abuse caused Ow or his fellow class members to suffer physical harm or mental suffering. The better view, Allianz argues, is that the entitlement to enhanced remedies under section 15657.5(a) depends on the definitions contained in *both* sections 15610.07(a), the general definition of "elder abuse," and 15610.30(a)(1), the specific definition of "financial abuse." Once one assumes that both sections are at issue, Allianz contends that the term "financial abuse" must be read in conjunction with the phrase "with resulting physical harm or pain or mental suffering."

Thus, citing to a federal district court decision from this district, Allianz argues that "[p]laintiffs are also required to allege physical harm or pain or mental suffering to support a claim for financial elder abuse." Derry v. Jackson Nat'l Life Ins. Co., No. 11-cv-0343, 2011 WL 7110571, at *7 (C.D. Cal. Oct. 5, 2011); see also Siemonsma v. Mut. Diversified Emps. Fed. Credit Union, No. 10-cv-1093, 2011 WL 1485979 (C.D. Cal. Apr. 19, 2011). In addition, Allianz cites a number of unpublished California Appellate decisions for the same principle, although these courts find as much without discussion. See In re Estate of Hazewinkel, D058282, 2011 WL 6396324 (Cal. Ct. App. Dec. 9, 2011) ("financial abuse" of an elder, with resultant physical harm or pain or mental suffering, is defined and forbidden. (§ 15610.07; remedies are provided in § 15657 et seq.)"); Raicevic v. Lopez, D055002, 2010 WL 3248335 (Cal. Ct. App. Aug. 18, 2010) ("Under the Act, 'financial abuse' of an elder, with resultant physical harm

---

[28] Where a plaintiff proves that a defendant has committed financial abuse in a reckless, oppressive, fraudulent, or malevolent manner, the Act also eliminates the damages limitation set forth in section 377.34 of the Code of Civil Procedure.

or pain or mental suffering, is defined and forbidden. (Welf. & Inst. Code, § 15610.07; remedies are provided in § 15657 et seq.) Under Welfare and Institutions Code section 15610.30, subdivision (a)(2), "financial abuse" may include assistance in another's wrongful taking of property of an elder, for a wrongful use or with intent to defraud."). Allianz also notes that at least one court has found that the term "neglect" to require a showing of resulting "physical harm, pain or mental suffering," relying on section 15610.07(a), analogous to Allianz's argument regarding "financial abuse." See Carter v. Prime Healthcare Paradise Valley LLC, 198 Cal. App. 4th 396, 408 (2011).

The Court concludes that the better view is that articulated by the only published California Court of Appeal decision addressing this issue: section 15610.07 does not apply to a plaintiff's claim that is premised upon a violation of section 15610.30. As the court held:

> To the extent respondents continue to assert that the financial elder abuse claim requires a finding that the [plaintiffs] suffered mental suffering, they are mistaken. The statute does not require a finding of mental suffering. Rather, the statute requires a finding that the defendant took the property for 'a wrongful use or with intent to defraud or both.' (Welf. & Inst. Code, § 15610.30, subd. (a)(1).) While cases may be brought under the elder abuse statute alleging mental suffering (see id., § 15610.07), the [plaintiffs] did not do so, nor did they allege emotional distress or seek damages for pain and suffering.

Bonfigli v. Strachan, 192 Cal. App. 4th 1302, 1316 (2011). Other published decisions from California lend further support to the notion that the requirement of "resulting physical harm or pain or mental suffering" from section 15610.07 should not be read in to 15610.30. See Wood v. Jamison, 167 Cal. App. 4th 156, 164 (2008) (upholding award of costs and attorneys' fees under section 15657.5 without any discussion of

section 15610.07); see also Das v. Bank of Am., N.A., 186 Cal. App. 4th 727, 744 (2010) (no mention of section 15610.07 in discussion of pleading requirements under 15610.30); Stebley v. Litton Loan Servicing, LLP, 202 Cal. App. 4th 522, 528 (2011) (same).[29]

In light of these published decisions, the Court finds Allianz's citations to unpublished opinions of the California Court of Appeal unpersuasive. See California Rules of Court, Rule 8.1115 ("[A]n opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action."). Moreover, the Court declines to address Allianz's arguments regarding the various canons of interpretation for determining the meaning of section 15610.07(a). According to the plain mandate of Bonfigli and the other decisions cited herein, the meaning of this section is not at issue when a plaintiff seeks the enhanced remedies for financial abuse available under section 15657.5. Finally, the Court declines Allianz's invitation to ignore the clear holding of Bonfigli—and the other decisions which Allianz does not discuss—in favor of unpublished decisions of the California Court of Appeals and a federal district court. See Ryman v. Sears, Roebuck, & Co., 505 F.3d 993, 994 (9th Cir. 2007) (holding that when "there is relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it"). Because the

---

[29] Plaintiffs appear to assume without discussion that section 15610.07 applies to section 15610.30, and therefore their argument is that the phrase "with resultant physical harm or pain or mental suffering" is only meant to modify "other treatment," and not the other types of abuse in section 15610.07. However, plaintiffs cite no authority in support of this reading of 15610.07, as Bonfigli did not interpret the language in section 15610.07 at all, but simply found that it does not apply when a plaintiff seeks the enhanced remedies available under section 15657.5 for financial abuse.

Court does not find that there is "convincing evidence" that the California Supreme Court would not follow <u>Bonfigli</u>'s interpretation of the Elder Abuse Act, Allianz's contention is without merit.  Accordingly, the Court denies Allianz's motion for judgment on the pleadings on plaintiffs' Elder Abuse Act claim, as plaintiffs are not required to allege physical harm or pain or mental suffering.

**V.      CONCLUSION**

In accordance with the foregoing, the Court DENIES Allianz's motion for judgment on the pleadings.

IT IS SO ORDERED.

Dated: March 4, 2013

_____

CHRISTINA A. SNYDER
United States District Judge